Louis WALTER, Lance Walter, individually, as Trustee of the Testamentary Trust created under the Will of Manuel Walter for the benefit of Toni Walter Stern, and as Executor of the Estate of Manuel Walter, Toni Walter Stern, the Walter Company, a California general partnership, Herbert Sturman, individually and as Executor of the Estate of Harvey Fierstein, and Paul Syphus, Plaintiffs,

v.

HOLIDAY INNS, INC., Harrah's New Jersey, Inc., Harrah's Atlantic City, Inc., and Marina Associates, a New Jersey Partnership, and Embassy Suites, Defendants.

Civ. A. No. 85–4833.

United States District Court, D. New Jersey.

Feb. 28, 1992.

Hillel Chodos, Los Angeles, Cal., Michael Blumenfeld, Fierstein & Sturman, Los Angeles, Cal., Richard D. Wilkinson, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for plaintiffs.

Joseph R. Sahid, New York City, Bruce I. Goldstein, Saiber, Schlesinger, Satz & Goldstein, Newark, N.J., Ronald Reid, Alston & Bird, Atlanta, Ga., for defendants.

## OPINION

RODRIGUEZ, District Judge.

This matter comes before the court on defendants' Motion for Judgment as a Matter of Law, pursuant to Fed.R.Civ.P. 50. For the following reasons, defendants' motion will be granted in part and denied in part.

## I. INTRODUCTION

This action, originally filed October 7, 1985, arises out of a series of transactions involving Harrah's Marina Hotel & Casino in Atlantic City, New Jersey. It involves big business and big finances, and is a paradigm of hopes and illusions experienced by entrepreneurs seeking high yields.

We begin when legalized gambling was in its infancy with only one casino open on the boardwalk in Atlantic City. The dream was that it would be an industry measured in billions of dollars, dollars which would be invested and spent not only in casino/hotels but also on almost every other facet of economic and social life.

Twenty-five casinos were planned for construction in January, 1979. Six casinos were planned for the marina area, a location two miles away from the Atlantic City Boardwalk.

Many were awakened from the dream by 1981 because the economic climate changed dramatically. Inflation was at thirteen percent (13%) annually. Of the six casinos that were open, only three were profitable. Six casinos were stalled in the planning stage and only one opened in the marina area, Harrah's Marina Hotel/Casino. Threatened competition from surrounding states added to the concern.

The facts are extensive and, at times, complicated; therefore, only an "abbreviated" factual setting is provided in order to address the issues in need of decision at this time.

The principle plaintiffs in this action, Lou Walter, Lance Walter, and Herbert Sturman, are investors who were seeking a business interest in the newly created Atlantic City gaming industry.[1] In August of 1978, they acquired an interest in property in Atlantic City as a prospective site for future construction. *See* Exh. 1047 at 2. The plaintiffs then courted the defendants, Holiday Inn, Inc., and enticed them to join the venture. *See id.* at 3. After some negotiation about the corporate entity's structure, in late 1978 the plaintiffs and the defendants entered into a 50–50 partnership agreement to build a hotel and casino in Atlantic City on the marina.[2] *See id.* at 3–4.

Midway through 1979, the partnership was able to obtain a bank loan commitment from the Midlantic Bank for $75 million. *See id.* at 7.

By 1980, construction of the hotel and casino was well under way. In May of 1980, the parties met to discuss expected shortfalls for the project, and the need for additional financing. *See* Exh. 1046.09, at 1–2. In June of 1980, the parties entered into a Memorandum of Understanding which included, *inter alia,* a section that directed the parties to attempt to obtain additional financing for the project.[3] *See* Exh. 565, at 2. Later that same month, the parties formally turned over the day-to-day operation of the hotel to Harrahs, Inc., although certain responsibilities remained with the partnership's executive committee. *See* Exh. 571, at 4.

By August of 1980, the parties had acquired an additional loan commitment from Midlantic Bank in the amount of $20 million, bringing the total loan commitment up to $95 million. Pursuant to this change, a

---

1. The other two significant players for the plaintiffs are Paul Syphus and William Dougal. Dougal was the general manager of L & M Walter Enterprises and Syphus was the casino manager and shareholder of L & M until November, 1980. L & M Walter Enterprises is the corporate enterprise which was formed by plaintiffs for the purpose of this venture. Bayfield Enterprises, Inc. was established by plaintiffs with the intent of having the eventual partner (Holiday Inn) assume the stock of Bayfield. Bayfield and L & M Walter formed the partnership known as Marina Associates.

 Others involved in this saga included: Walter Haybert, Chief Financial Officer of Marina Associates who ran the financial affairs of the partnership business; David Patterson, director of the Corporate Planning Department of Holiday Inns; Katie Bradshaw Dwyer, planning analyst at Holiday Inns until December 1980, the Director of Planning and Analysis at Harrah's; Michael Regan, financial analyst at Harrah's in 1981; William Placke, Executive Vice–President of Midlantic National Bank responsible for the Corporate Banking Department; Craig Norville,

General Counsel of Promus Companies, Associate General Counsel of Holiday Inns in 1981; Philip Satre, Vice President, General Counsel and Secretary of Harrah's in 1981; Edward Ellis, former General Counsel and Senior Vice President of Holiday Inns, he left Holiday in 1984; Charles D. Solomonson, retired Senior Vice President and Chief Financial Officer of Holiday Inns, he left Holiday in 1987; and Richard Goeglein, Executive Vice President, member of the Board of Directors and member of the Gaming Committee of Holiday Inns in 1981, President and Co–Chief Executive Officer of Harrah's and member of Marina Associates Executive Committee.

2. This casino became known as Harrah's Marina Hotel and Casino.

3. The June 6, 1980, Memorandum of Understanding states "The parties shall attempt to obtain maximum additional exculpatory financing for the project ... The parties shall exert their best efforts in obtaining such financing on a commercially feasible basis."

loan modification agreement was executed. *See* Exh. 1047, at 8.

It is at this point in time when events seemed to spin out of control. The construction costs for the project began to skyrocket, the management of the project site became an issue of concern, and everyone's eyes were directed towards the worsening economic condition faced by the country. To help compound the problem, the New Jersey Casino Control Commission notified the parties that the casino could not open if two top management people, William Dougal and Paul Syphus, were involved in the management. Both had been brought to the project by Lou Walter.

The Harrah's Marina Hotel and Casino opened its doors on November 22, 1980. Although the project was not fully completed, the casino was in operation and all the necessary licensing was in place to permit gambling. *See id.* at 9. By mid-January of 1981, the executive committee met to discuss the cost overruns and address concerns about the project. *See id.* at 10.

At this January meeting, the plaintiffs were presented with "worst case" projections for future earnings of the project. *See* Exh. 613, TAB A, at 2.[4] Despite these immediate concerns, it appears that the defendants remained sanguine regarding the viability and profitability of the project. This is reflected in the forecasts presented at the March executive committee meeting, *See* Exh. 613, TAB B, Exh. 702, at 4, in which a mid-case forecast projecting $14.1 million in profits for 1981 was presented. *See id.* Trans. at 6472, 6481–82; Trans. at 6803–04; Trans. at 1495–96; Trans. at 1832. This projection proved overly opti-

mistic.[5] *See* Exh. 1011.01, at A04503; Exh. 1011.03, at A03085; Exh. 1013, TAB E. Trans. at 6691–92, 6769; Trans. at 6495; Trans. at 8778–80.

During this period, the plaintiffs did not invest additional money, and decided that they were interested in selling their shares in the partnership. The plaintiffs approached the defendants with offers to sell,[6] *see* Exhs. 1046.15, 1227, 723 at 4–5; Trans. at 6421–22, 6426–28; Trans. at 4283, 4285–86, and also engaged in discussions with other entities.[7] *See* Trans. at 6693–94; Trans. at 6506.

Although the plaintiffs did not agree to a sale of their interest until May 9, 1981, *see* Exh. 1047, at 11–12, they did not honor at least two requests for additional equity contributions ("cash calls") made by Bayfield to L & M Walter. The hotel and casino, meanwhile, continued to operate, and construction neared completion. *See* Exh. 625; Exh. 1386; Exh. 626.

On July 2, 1981, the buy-out agreement between the plaintiffs and defendants was consummated. As part of the agreement, the defendants agreed to pay the plaintiffs $10.9 million (present value) for their interest, to be paid over a twenty year period at the rate of $1.75 million a year for a guaranteed payout of $35 million. The plaintiffs would also retain a 1% interest in the project. *See* Exh. 1047, at 11–12.

Between January and July, 1981, three significant events occurred. First, in anticipation of the buy-out negotiations, the defendants prepared a financial projection that included a 10–year projection and a

---

**4.** At the January 17, 1981 Executive Committee meeting, Walt Haybert, Chief Financial Officer of Marina Associates, presented a "worst case" projection of profit and loss for 1981 with related projections of monthly cash flow. Included in the projections was an end-of-year income statement for 1981 which reported net income before taxes at a $7,480 loss.

**5.** According to the Marina Associates 1981 year-end income statement, net income proved to be only $1,340,000.

**6.** In a January 8, 1981 memo to L & M Enterprises, Herbert Sturman stated that "the most

expeditious way of handling the situation would be in our opinion a buy out of L & M Enterprises by HIA." In a letter dated April 18, 1981 to Ed Ellis, Mr. Sturman reiterated his intentions of selling L & M Enterprises to HIA. Further, both Sturman and Ellis testified that during the spring of 1981 the plaintiffs were interested in selling L & M Enterprises to HIA.

**7.** Herbert Sturman and Lance Walter, plaintiffs in this suit, both testified that in the spring of 1981 they approached "various people" including Security Pacific Mortgage, Lehman Brothers, American Motors, Donald Trump, Openheimer, and Cantor Fitzgerald.

35–year forecast. This report, known as the Boxer Report, indicated that the defendants were projecting large profits for the hotel/casino project.[8] *See* Exh. 734. This projection, based on the current financial statements and projected growth, was not seen by the plaintiffs prior to the buy-out. *See* Plaintiffs' Brief in Opp. at 52–54. There is some conflicting evidence as to whether the plaintiffs were even informed of its existence. *See Id.* at 52–54. For present purposes, however, what is important is the fact that although the projection itself was not seen by the plaintiffs, the factual bases upon which it was generated was in their possession. *See* Exh. 1004.01–1104.09; 1008.01–1008.15; Exh. 1009.01–1009.08; 1014.01–1014.06; Exh. 1015.01–105.14.

The second important event was the emergence of the Transaction Review Group report. This report, prepared by the defendants, discusses the problems and concerns regarding the marina project cost overruns. *See* Exh. 749, at 5. What is most important, according to plaintiffs, is that the report reveals mismanagement as a culprit for the significant cost overruns. *See* Plaintiffs' Brief in Opp. at 46–47.

The third noteworthy event was the fact that the project turned profitable. Although 1981 ended with roughly $1 million dollars in profit for the defendants, *See* Exh. 1011.01, at A04503; Exh. 1011.03, A03085; Exh. 1013, TAB E); Exh. 1042 at 5, by 1983 the project was generating substantial sums of money for the defendants. In fact, 1983 was one of the most profitable years to date for the project.

Despite the high profit, in mid-July, 1983, the plaintiffs decided to sell their remaining 1% interest to the defendants for $1.8 million. *See* Exh. 1329 at 2. This they did, and the relationship between the parties was ended, with the defendants holding the entire interest in the project. *See* Exh. 100.29; Exh. 1001.42; Exh. 1047 at 12–13.

All was well until 1985, when the plaintiffs were piqued by a comment made by another developer in Atlantic City, Donald Trump. *See* Plaintiffs' Brief in Opp. at 59. An article published in the newspaper quoting an estimate made by Donald Trump prompted Sturman in June of 1985 to pursue a conversation with Trump, and through lawyers in his firm, to commence an investigation. *See* Trans. at 6623 (stipulation of the parties). The plaintiffs then brought this action, alleging securities fraud, common law fraud, and breach of fiduciary duty. The plaintiffs further sought rescission of the sale and punitive damages. Estimated damages approached $1 billion dollars.

Through six years of pretrial discovery and motions, over five hundred entries found their way onto the docket sheet. Finally, on September 4, 1991, the matter was ready for trial.

After approximately 40 days of trial, the plaintiffs rested. Although the amount of testimony received was substantial, what became most important was the plaintiffs' choice to call only two of the five principals involved. It was not explained why William Dougal, the general manager of L & M Walter Enterprises, or Paul Syphus, at one time the casino manager and shareholder of L & M Walter Enterprises, did not testify. Particularly noteworthy because of his absence was Lou Walter, the basic architect of the original deal and, as plaintiffs' attorney suggested, "the visionary" of the project.

Throughout the trial, reference was made to Lou Walter's involvement in the project development. The Report of the Transaction Review · Group, an exhibit whose veracity is not disputed by the plaintiffs, describes Lou Walter's involvement with the project as follows:

> There was a perception at this time that [Lou] Walter would coordinate the construction side of the project. His concept was fast track, "design as you go" construction in which ground would be broken in January 1979 and the building open by September 1979, and he wanted

---

**8.** The Boxer Report is a 35 year financial forecast prepared by the defendants. The report projected that the present value of 100% of Marina Associates' anticipated future cash flows ranged from 114.1 million to 146.4 million.

to be the general contractor for the project....

Walter was very involved with [the construction manager] ... in selecting the contractors and in finalizing their contracts. He participated in bid meetings with contractors and was much in evidence throughout the contractor selection process, according to [the construction manager]. If Walter had not been involved, [the construction manager] indicates they would have handled the process differently....

....

During construction, Walter was involved in monthly construction meetings with [the construction managers].... Early in the construction phase, according to [the construction manager], Walter influenced decisions regarding construction....

Walter was instrumental in establishing November 16, 1980 as the opening date, understanding that meant commencing overtime, and took the attitude of whatever it takes, get it open. According to [the construction manager], Walter had wanted to get the laborers in to put in the overtime necessary to get the job completed six months prior to the August 1980 decision to open the facility November 16.

There is general opinion that Lou Walter had tremendous influence on the construction process. According to [the interior designers], Walter was responsible for the delay in their completion of the specifications for the job from February until spring of 1980. Walter make numerous requests and suggestions and attempted to impact the interior designs by imposing his wishes on the [ ] designers....

According to Don Hart, [the Owners' on-site representative,] dealing with Walter on a daily basis took fifty percent of his energy for the full term of the project....

Exh. 749 at 86–90.

There are also numerous references to Mr. Walter's role in the project from witnesses that did testify. Mr. Goeglein indicated "that Lou Walter was intimately and personally involved in every, virtually every, change order ... There wasn't a thing that went on in that project ever, not ever, ... through its opening [ ] that Lou Walter was not personally hands on intimately involved in...." Trans. at 1360–61. Ed Ellis indicated "[Lou Walter] was responsible for construction and he had that responsibility and exercised it, until very late in the construction...." Trans. at 4610. At the March 18, 1981 executive committee meeting, Ken Archer, an owner representative for the project, stated "that he had met on several occasions with Lou Walter to discuss change orders and requested Mr. Walter's approval of change orders in advance when they involved work that was not performed prior to January 19, 1981. Mr. Walter said he approved the procedure utilized by Mr. Archer...." Exh. 702 at 2.

This record of Mr. Walter's involvement stands unrefuted before the court. In addition, the minds of the principals with the most knowledge and experience were never probed.

This motion for judgment as a mater of law followed the close of plaintiffs' case.

## II. DISCUSSION

### A. *Standard of Review*

Pursuant to Fed.R.Civ.P. 50(a), the defendants are entitled to judgment as a matter of law if the plaintiffs "ha[ve] been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for [the plaintiffs] with respect to that issue...." Judgment as a matter of law, which takes the place of the now-defunct directed verdict, "effects no change in the existing standard." Fed.R.Civ.P. 50 (1991 Amendment, comment).

Therefore, in deciding a motion for judgment as a matter of law, the court

do[es] not follow the rule that a scintilla of evidence is enough. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is

evidence upon which the jury could properly find a verdict for that party.... *Patzig v. O'Neil,* 577 F.2d 841, 846 (3d Cir.1978), *quoting* 9 Wright & Miller, *Federal Practice & Procedure,* 2524, at 542–43 (1971) (footnote omitted). As the Third Circuit noted,

> [t]hese motions require the judge "to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. [The judge] must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding."

*Massarsky v. General Motors Corp.,* 706 F.2d 111, 119 (3d Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983) (citation omitted). It is with this high standard in mind that the court considers the present motion.

### B. *Partners and the Corporate Veil*

■ The defendants insist in their motion that Bayfield was the real partner with the plaintiffs in the marina project, and therefore defendant Holiday Inns did not owe the plaintiffs any fiduciary duties whatsoever. This argument is without merit.

New Jersey has adopted the traditional view of *alter ego* liability, which allows for piercing of the corporate veil to remedy "cases of fraud, injustice, or the like...." *State, Dep't of Envtl. Protection v. Ventron Corp.,* 94 N.J. 473, 500, 468 A.2d 150 (1983). In order to pierce the corporate veil, a court must find

> that the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent.... Even in the presence of corporate dominance, liability generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law.

(citations omitted). *Id.* at 501, 468 A.2d 150.

This rule, however, is not without exceptions. As one court has noted, "[e]quity will go behind the corporate form where necessary to do justice...." *Kugler v. Koscot Interplanetary, Inc.,* 120 N.J.Super. 216, 254, 293 A.2d 682 (Ch.Div.1972). In order to help a court determine whether to "go behind the form" courts are guided by a number of factors. These include

(1) ownership of the subsidiary's stock, (2) identity of officers and directors of the corporation, (3) financial arrangements of the corporation, (4) responsibility over day-to-day operations of the subsidiary, and (5) payment of the subsidiary's salaries and expenses.

*Environmental Tectonics Corp., Int'l v. W.S. Kirkpatrick & Co.,* 659 F.Supp. 1381, 1388 (D.N.J.1987), *aff'd in part,* 847 F.2d 1052 (3d Cir.1988). These criteria allow a court to determine whether

> "from all the facts and circumstances it is apparent that the relationship between the parent and subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two so mingled, that recognition of the distinct entity would result in an injustice...."

*Hoffman v. United Telecommunications, Inc.,* 575 F.Supp. 1463, 1478 (D.Kan.1983) (citations omitted).

In this case, it is clear that Holiday Inn was the true entity behind Bayfield, and that the control by Holiday Inn over Bayfield was absolute. Therefore, it would be an injustice to allow form to defeat substance, and treatment "of the two as one is warranted." *Environmental Tectonics,* 659 F.Supp. at 1388.

### III. THE CLAIMS

#### A. *Rescission*

■ The plaintiffs argue in their brief in opposition that they have acted in a manner consistent with a claim for rescission, and therefore are entitled to have the jury decide the issue. *See* Plaintiffs' Brief in Opp. at 58–61. The plaintiffs' argument, however, misses the mark.

■ Rescission is an equitable remedy and only available in limited circumstances. *See Hilton Hotels Corp. v. Piper Co.*, 214 N.J.Super. 328, 519 A.2d 368 (Ch.Div.1986); *Josefowicz v. Porter*, 32 N.J.Super. 585, 108 A.2d 865 (App.Div.1954). New Jersey courts have long held that equitable jurisdiction cannot and should not be exercised when there is an adequate remedy at law. *See Sudol v. Rudy Papa Motors*, 175 N.J.Super. 238, 242, 417 A.2d 1133 (N.J.Dist.Ct.1980), *citing State v. Singletary*, 153 N.J.Super. 505, 516, 380 A.2d 302 (Law Div.1977).

■ Furthermore, the remedy of rescission is generally only available when the party seeking to rescind can restore the other party to the *status quo ante*. *See Medivox Prods., Inc. v. Hoffmann–La Roche, Inc.*, 107 N.J.Super. 47, 75–76, 256 A.2d 803 (App.Div.1969). *See generally*, 17 Am.Jur.2d, *Contracts*, § 482 (1991). In order to impose rescission, "[a] court must be able to return the parties to the 'ground upon which they originally stood.'" *Hilton Hotels Corp. v. Piper Co.*, 214 N.J.Super. 328, 336, 519 A.2d 368 (Ch.Div.1986) (citations omitted). As the court in *Hilton Hotels* noted, "[a]ny effort to return these parties to the position they held six years ago is neither realistic nor fair...." *Id.* at 336, 519 A.2d 368.

In the instant case, four years had elapsed between the sale of the plaintiffs' interest to the defendants and the filing of suit. It has been ten years since the initial buy-out to the time of trial. Prior to and after the buy-out, the defendants infused some $24.8 million dollars of capital into the project for development. Subsequent to this, the defendants have contributed $215 million for maintenance and upgrading of the facility. *See* Exh. 1013.

Under these circumstances, it would be virtually impossible for the court to "unmake" the buy-out transaction so as to restore the parties to the *status quo ante*. *See U.S. v. Texarkana Trawlers*, 846 F.2d 297, 304 (5th Cir.), *cert. denied*, 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988). Moreover, the court does not see "circumstance[s] ... which would justify rescission." *Hilton Hotels*, 214 N.J.Super. at 336, 519 A.2d 368.

This conclusion is supported by the fact that an adequate remedy at law exists. The plaintiffs' interest is not so "unique" as to make money damages inadequate because they were willing to sell at the "right price." Trans. at 7698–7709. They can present evidence indicating the *quantum* of monies they have been deprived and thus be fairly compensated.

The equities in this case militate against rescission of the buy-out agreement because the court cannot fairly return the parties to the "ground upon which they originally stood." *Driscoll v. Burlington–Bristol Bridge Co.*, 28 N.J.Super. 1, 4, 99 A.2d 829 (App.Div.1953). Rather, the adequate remedy of damages is all that is available to plaintiffs. Therefore, the defendants' judgment as a matter of law as to the rescission claim will be granted.

### B. *Fiduciary Duty*

The defendants next move for judgment as a matter of law as to the claim of breach of fiduciary duty. Defendants argue no duty existed between themselves and plaintiffs because they were not partners. This argument was rejected *supra*. Secondly, defendants argue that, in the adversarial context of a buy out, a fiduciary duty cannot be found. And lastly, the defendants suggest that, even were a duty found, no "reasonable jury" could find a material breach of the duties owed. *See* Defendant's Brief in Sup. at 12–31.

Plaintiffs counter with the assertion that there was more than enough evidence presented to conclude that the defendants were the real party in interest; that defendants did owe plaintiffs a fiduciary duty and that defendants breached their duty. The plaintiffs claim that the nature of the buy-out was not "adversarial," and therefore the fiduciary duty was not impinged in any way. *See* Plaintiffs' Brief in Opp. at 18–21.

In order to determine the obligations of the parties, this court must inquire into the nature of the relationship as it existed at the time preceding and during the buy out

period. It is only through a careful examination of the factual record that this court can decide, as a matter of law, whether obligations existed.

### 1. The General Rule

■ As discussed *supra*, the parties entered into an agreement to build a hotel/casino in the fall of 1978. Soon thereafter, in early 1980, the plaintiffs expressed an interest in selling their shares of the venture to the defendants. *See* Trans. at 7541–43.[9]

There is some factual dispute as to the state of relations between the parties in the period between their initial interest in selling and actual confirmation of the sale in May of 1981. It is clear, however, that at some point in time the relationship between the parties broke down and became adversarial in nature.

■ The obligation of partners *qua* fiduciary has been generally established as follows:

[w]here persons engage in a common enterprise by way of joint venture, each has the right to demand and expect from his associates the utmost good faith. Each coventurer is entitled to demand and expect fairness, integrity, righteousness, faithfulness, honesty, and loyalty, from the other coventurers in all that relates to their common interests.

Generally, the parties to a joint venture stand in a fiduciary relation, each to the others, or in a close relationship of trust and confidence, and are bound by the same standards of good conduct and square dealings as are required between partners. Each member of a joint venture has the right to demand and expect from his associates full, fair, open, and honest disclosure of everything affecting the relationship.

48A C.J.S. *Joint Ventures* § 24 (1981) (citations omitted).[10] Obviously, when a fiduciary duty exists, the duty among and between parties to disclose all relevant information remains high. *See Silverstein v. Last,* 156 N.J.Super. 145, 152, 383 A.2d 718 (App.Div.1978) (requirement of utmost good faith "continues with undiminished vitality...."); *Konsuvo v. Netzke,* 91 N.J.Super. 353, 368–69, 220 A.2d 424 (Ch. Div.1966) (noting that the fiduciary duty is the " 'punctilio of an honor the most sensitive....' " *quoting Meinhard v. Salmon,* 249 N.Y. 458, 164 N.E. 545 (Ct.App.1928) (per Cardozo, J.,)); 59A Am.Jur.2d *Partnership* § 420 at 453 (1987) (noting that "[i]t is a fundamental characteristic of partnership that the partners' relationship is one of trust and confidence when dealing with each other in partnership matters" (footnotes omitted)).

Carved from this high standard, however, is an exception adopted by New Jersey. In *Fravega v. Sec. Sav. & Loan Ass'n,* 192 N.J.Super. 213, 469 A.2d 531

---

**9.** A dispute exists about when the plaintiffs began to express an interest in selling their shares. Exhibit 1097 indicates that by November 2, 1979, the defendants had a recognized interest in Sturman's shares. *See* Exh. 1097 at 2. Although Sturman testified that he had very vague recollections regarding the defendants' interest in acquiring the plaintiffs' shares, prior to the April, 1980 meeting, *see* Trans. at 7542–43, the record indicates that on March 28, 1980, he delivered to L & M Walter Enterprises a memorandum entitled "Tax Consequences and Related Item Pertaining to Potential Acquisition of L & M Walter Enterprises Stock by Holiday Inns, Inc." *See* Exh. 1046.03. Sturman testified that he was "not actively thinking about [a buy-out]. I have a fertile mind, I think and I think about a lot of situations." Trans. at 7543.

**10.** Under New Jersey law, joint ventures are virtually identical to partnerships, and the same rules apply to both relationships when determining the respective parties' obligations. *See, e.g., 68th St. Apts., Inc. v. Lauricella,* 142 N.J.Super. 546, 559 n. 2, 362 A.2d 78 (Law Div.1976), *aff'd,* 150 N.J.Super. 47, 374 A.2d 1222 (1977) (holding the rules of law which apply to partners also apply to joint ventures); *Kozlowski v. Kozlowski,* 164 N.J.Super. 162, 171, 395 A.2d 913 (Ch.Div.1978), *aff'd,* 80 N.J. 378, 403 A.2d 902 (1979) (noting the elements of a joint venture are virtually identical to those required for a partnership and the rules of law which apply to partners also apply to joint ventures); *Silverstein v. Last,* 156 N.J.Super. 145, 152, 383 A.2d 718 (App.Div.1978) (stating the classification of relationship as a joint venture or partnership is immaterial in terms of fiduciary obligations owed by one participant to another); A. Bromberg & L. Ribstein, 1 Bromberg and Ribstein on Partnership § 2.06(a), at 2:42–43 (1988) ("Most courts have chosen to distinguish between isolated transactions and continuing enterprises by classifying the former as joint ventures and ap-

(Ch.Div.1983) the Superior Court noted that parties who would normally have a fiduciary obligation to one another can expect that obligation to expire when an adversarial posture is adopted. As the court observed, "the imposition of a fiduciary obligation in this setting seems questionable. Although a joint venturer, when acting within the scope of the common enterprise, admittedly has an obligation to act toward his coadventurers with utmost good faith, *Stein v. George B. Spearin, Inc.,* 120 N.J.Eq. 169, 176, 184 A. 436 (Ch.1936), that standard would not appear to logically extend to transactions where the relationship between the parties is, by nature, adversarial." *Id.* at 223, 469 A.2d 531.

It is plain, then, that the issue of whether or not the relationship was adversarial is pivotal to the fiduciary duty question. During trial, plaintiff Sturman was consistently reluctant to define the relationship with the defendants as adverse. *See* Trans. at 7788–89. However, Sturman conceded that in a certification submitted to this court, he defined the relationship between the parties as "adverse or potentially adverse." *See* Trans. at 7789–90. Sturman also testified that during the buy-out time period, he treated the negotiations between the parties as if he were attempting to settle a case for his clients, *id.* at 7790, and that he was trying to get the best price for his clients. *Id.* at 7793.[11]

In addition to Sturman's testimony, there is ample evidence that further supports the finding of a tense, if not hostile, environment between the parties. Philip Satre, a witness called by the plaintiffs, indicated that the relationship between the parties was in "a contentious state" during several of the executive committee meetings, and that it can hardly be said the parties were "shoulder to shoulder." *Id.* at 2169–70. Craig Norville also testified that negotiations regarding the renegotiation of the partnership agreement had gotten "ex-

tremely contentious." *Id.* at 6000. The situation was such that Norville wrote a letter to the plaintiffs that said in part "[t]o put it plainly, we are fed up with your perpetual renegotiation of points already agreed on. We will continue to try to hold things together despite your conduct, but the implications of your apparent repudiation of agreements are staggering." Exh. 1188.

A few months prior to the buy-out, the relationship of trust and confidence had deteriorated to the point where the plaintiff believed it necessary to have an independent auditor review the books and records of the partnership for the entire period of the partnership's existence. *See* Exh. 681. This independent audit was called for in large part due to the plaintiffs' questioning of the propriety of expenses being incurred on the partnership's behalf. *See* Exh. 657 at 2.

Given the environment in which the parties were operating, it seems clear that traditional notions of fiduciary duty were inapplicable. As the court in *Fravega* commented, "[w]here [a partner] may reasonably rely on the good faith and fair dealing of a partner ... in carrying out the common goals of the joint venture, the dissolution of that joint venture places the principals in a different light. In such a setting each [partner] may reasonably expect the other to seek a position which is in that [partner's] best interest, and the elements of trust and reliance necessary to fiduciary obligation would not be present." *Fravega,* 192 N.J.Super. at 223, 469 A.2d 531, *citing Sind v. Pollin,* 356 A.2d 653, 655 (D.C.App.1976); 48A C.J.S. *Joint Ventures* § 24 (1981).

In trying to determine when this "adverse interest" exception applies, a court should consider the totality of the circumstances surrounding the relationship. The mere deterioration of the working environment or one instance of bad blood would be

plying partnership law with little or no modification.").

11. In a memorandum from Mr. Sturman to the L & M Walter Enterprises General File, Sturman memorializes a conversation between the parties. Sturman indicates that the plaintiffs felt "the most expeditious way of handling the

situation would in our opinion be a buy-out of L & M Walter Enterprises, Inc. by [Holiday Inn]...." Exh. 1046.15 at 1. Sturman also indicates that "[a]ll of us [the plaintiffs] are in agreement that we will have to do homework for [Holiday Inn] and come up with an attractive package." *Id.* at 4.

insufficient to trigger a dissolution of the duty. However, when a partner announces his explicit intention to sell his interest, as the court in *Fravega* noted, it is reasonable to expect the parties "to seek a position which is in that [parties'] best interest...." *Fravega*, 192 N.J.Super. at 223, 469 A.2d 531.

Indeed, the plaintiffs themselves conceded that "Holiday had no obligation to them—fiduciary or otherwise—to disclose the highest price it was actually willing to pay for plaintiffs' interest, any more than plaintiffs had any obligation—fiduciary or otherwise—to disclose to Holiday the lowest price they would be willing to take." Trans. at 8144. Further, in discussing the cash flow figures that Sturman was able to mentally calculate at the March Executive Committee meeting, Sturman conceded he felt no obligation to pass the information on to defendants, because "they were smart enough to figure out what I figured out." Trans. at 7338–7346. Obviously, plaintiffs themselves felt no compulsion to divulge all the information they possessed and were seeking to preserve their own "best interest."

It is important to bear in mind the limited scope of this exception. That the parties are not entitled to substitute a new entity for the adverse partner is clear. It is also pellucid that the non-selling partners, facing a change in the partnership's infrastructure, are entitled to seek an independent audit to determine the value of each partner's share. So long as the parties do not work to compromise the *res* of the partnership itself, then there is no fiduciary obligation to turn over material that has been prepared by one side, for one side, due to the adversarial nature inherent in a buyout.

In affirming this principle, the court is not unaware of those states which choose to impose the strictest fiduciary obligations upon partners even when negotiating the dissolution of the partnership. *See, e.g., W.A. McMichael Constr. Co. v. D & W Properties, Inc.*, 356 So.2d 1115, 1122 (La. Ct.App.), *cert. denied*, 359 So.2d 198 (La. 1978) ("The fiduciary duty of the partners is particularly applicable when one partner seeks to purchase the interest of another partner. Such a sale will be sustained only when it is made in good faith, for a fair consideration, and on a full and complete disclosure of all important information as to value. Each partner must refrain from taking any advantage of another partner by the slightest misrepresentation or concealment of material facts."); *Karle v. Seder*, 35 Wash.2d 542, 214 P.2d 684, (1950) (A sale by one partner to another, of his interest in the partnership, "will be sustained on a full and complete disclosure of all important information as to value."); *Miller v. Miller*, 700 S.W.2d 941, 946 (Tex.Ct.App. 1985) ("[T]he purchasing partner [has] the absolute duty to disclose to the selling partner material facts within his knowledge and ... such a sale [will] be sustained only when it is made in good faith, for a fair consideration, and as full and complete disclosure of all important information as to value."); *cf. Babray v. Carlino*, 2 Ill. App.3d 241, 276 N.E.2d 435, (1971) (where "the consideration [is] fair and adequate and ... a full and frank disclosure of all relevant information [is] made, the assailed transaction will be approved."). *But see Elmore v. McConaghy*, 92 Wash. 263, 159 P. 108 (1916) (holding that when partners start negotiating between themselves for the sale of one partner's interest, the fiduciary relation ceases to exist).

Although these cases have ample support, the reasoning behind *Fravega* is most compelling. The plaintiffs concede that the fiduciary obligation would not require the defendants to disclose the price they would be willing to pay for the co-partners' share. *See* Trans. at 8144. But this is exactly what would be required were this court to impose the fiduciary duty as envisioned by the plaintiffs. If similar circumstances were to arise, and a partner offered $10 million for a co-partners' share, while actually believing it to be worth more, a cause of action for breach of fiduciary duty would lie. A suit would be avoided only if the purchasing partner disclosed what she considered to be the most she would pay for the seller's share and the seller disclosed the least she would accept. This

situation imposes far greater burdens on partners involved in negotiating a sale of a partnership interest than is feasible in standard business transactions.

The expiration of the fiduciary duty under the "adverse interest" exception, however, does not give the parties free reign to commit unlawful practices such as fraud or deceit. Further, it does not permit parties to withhold information vital to maintaining the *res* of the partnership. But what it does allow is for a party in a "buy-out" situation to negotiate for their own benefit.

By its very nature, the "adverse interest" exception survives only for the duration of time that the partners are dealing with one another at arms length. If, by concession or otherwise, the relationship is restored to its pre-adverse state, then the fiduciary duty is revived and reinstated with full force. The cloud of hostile negotiating has been lifted, and the parties may continue the business at hand, namely furthering the goals of the partnership. The logical need for pursuing an independent interest will no longer hold true for the reunited partners.

In considering the "adverse interest" exception and applying the facts of this case as described more fully *supra*, it is not difficult to conclude that the defendants are entitled to a judgment as a matter of law regarding fiduciary duty. The plaintiffs were negotiating a sale of their interest for some time, and as Sturman testified, he placed the interests of the plaintiffs over those of the partnership. *See* Trans. at 7788, 7793. The record is also replete with characterizations of the relationship between the partners as "contentious" and "hostile." *See, e.g.,* Trans. at 2168–70; Trans. at 3407–08. And finally, the plaintiffs informed the defendants of their intent to sell their interest, and also indicated that they would be seeking the best price from other potential buyers. In

this setting, the adverse interest rule would apply with justifiable force.

The plaintiffs argue in their answer to defendants' motion that the defendants had a fiduciary duty to give the plaintiffs "a true account of his (the fiduciary's) best opinion and predictions about the future." Brief in Opp. at 12. This statement is incorrect for two reasons. First, it presupposes the existence of the fiduciary relationship. However, as discussed *supra,* the traditional relationship is mutated when the parties take adverse positions. There was no fiduciary duty to disclose this information. Secondly, as will be discussed *infra,* even were a fiduciary duty found, it would not extend to projections that are generated from existing facts available to both parties.

This court therefore finds that no reasonable jury could have found, as a matter of law, that a fiduciary duty existed during the time the parties were negotiating a buy-out.

### C. *Fiduciary Duty Redux*

■ Plaintiffs allege a breach of fiduciary duty on a number of grounds. Of primary concern is the defendants' withholding of a projection (the "Boxer Report") that calculated the potential profits for the hotel over a ten year period. This projection also included a 35 year forecast. According to plaintiffs, had they known about this optimistic projection, they would not have sold their interest in the hotel/casino project. They further argue if they had sold, they would undoubtedly have received more for their interest than the $10.9 million (present value) that they accepted from the defendants. *See* Exh. 734. Plaintiffs also allege a breach of fiduciary duty related to the timing and amount of the "cash calls,"—the alleged "cash-call strategy," and the defendants' failure to fully explain the provisions of the Midlantic loan.[12]

---

12. According to the plaintiffs, the defendants' "cash call strategy" was to call for more money up front than was actually needed to finance the project. Plaintiffs allege that the defendants' failure to modify the projected cash call figure was fraud and a breach of fiduciary duty. *See*

Plaintiff's Suppl. Brief at 4. However, plaintiffs do not challenge the validity of the *actual* cash calls made. *See* Trans. at 8083–84. *See infra* for a discussion of this claim as a breach.

As for the Midlantic loan, plaintiffs contend that they were unaware that $3.1 million re-

Although this court has already held that the fiduciary obligation expired when the relationship became adversarial, *see supra*, even were this not the case, defendants would be entitled to judgment as a matter of law on the question of fiduciary duty.

It is a recognized exception to the common law duty of full disclosure in partnership law that a partner satisfies his fiduciary obligations if he makes all information regarding the business of the partnership available to his co-partners. As two commentators have observed, "[f]acts, such as those appearing on the firm books, to which all partners have equal access need not be divulged." H. Reuschlein & W. Gregory, Handbook on the Law of Agency and Partnership, § 189, at 280 (1979), *citing Bradley v. Marshall*, 129 Vt. 635, 285 A.2d 745 (1971). *See also* Vestal, *"Ask Me No Questions and I'll Tell You No Lies": Statutory and Common–Law Disclosure Requirements with High–Tech Joint Ventures* 65 Tul.L.Rev. 705, 727–35 (1991) (discussing and comparing common-law disclosure requirements with those of the Uniform Partnership Act). *Cf. Stainton v. Tarantino*, 637 F.Supp. 1051, 1071 (E.D.Pa.1986) (noting that partner claiming breach of fiduciary duty for failure to disclose financial information about the partnership would not require dissolution, where plaintiff never "pressed" the defendant partner for information); *Burke v. Farrell*, 656 P.2d 1015 (Utah 1982) (holding that there is no affirmative duty to disclose information as to value of the partnership by a partner who bought the interest of the managing partner who kept partnership records); Bromberg & Ribstein, Bromberg & Ribstein on Partnership § 6.06 at 6:64 (1988) (noting that "[t]he extent of the duty to disclose depends on the circumstances of the individual case, ... [and] may depend on the degree to which the parties have access to accurate financial records....); Bromberg, Crane & Bromberg, On Partner-

ship § 67 at 387 (1968) (observing that "[t]here is no duty of disclosure of facts of which all partners have an equal opportunity to be informed, such as facts appearing on the books...." (footnote omitted)).

In this case, the state of the record indicates that the plaintiffs had access to voluminous amounts of information, and were indeed in receipt of hundreds of pages of relevant information. *See* Exhs. 1004.01–1104.09; 1008.01–1008.15; 1009.01–1009.08; 1014.01–1014.06; 1015.01–1015.14. Plaintiffs were provided with the factual foundation upon which the calculations regarding future income were generated. In such instances, any fiduciary obligations in existence were satisfied by the defendants when they provided the plaintiffs with the facts necessary to make future valuations.

The requirement of providing future projections, or "soft" information, as part of the fiduciary duty is further undermined when the state of the law in 1980–81 regarding soft information is considered.

As the Third Circuit noted in *Flynn v. Bass Bros. Enterprises, Inc.*, 744 F.2d 978, 985 (3d Cir.1984):

> [a]s a matter of public policy, the SEC and the courts generally have not required the inclusion of appraised asset valuations, projection, and other "soft" information in proxy materials or tender offers.... The reasons underpinning the SEC's longstanding policy against disclosure stem from its concern about the reliability of appraisals, its fear that investors might give greater credence to the appraisals or projections than would be warranted, and the impracticability of the SEC's examining such appraisals on a case by case basis to determine whether they are sufficiently reliable to merit disclosure.

(footnote and citations omitted).[13]

These concerns, as articulated by the Third Circuit, apply with equal force to the

---

mained to be drawn down on this loan, even though documents they had in their files so indicated. Plaintiffs argue this money could have been used to offset the cash calls. *See* Plaintiff's Suppl. Brief at 5. They also allege that the defendants presumably breached their

fiduciary duty by failing to disclose to them that the "hold-back" provision of the loan had been waived. *See id.;* Exh. 618.

**13.** *Flynn* involved non-disclosure between a corporation and minority shareholders in conjunction with a tender offer. *See Flynn*, 744 F.2d at

fiduciary duty in this case. Partners, with equal access to information about the business of the partnership, could be influenced unfairly when trying to determine the value of their share of the partnership. Furthermore, serious conflicts could arise if a projection that was prepared by a partner proved to be overly optimistic. Indeed, as the Third Circuit noted in a securities fraud case similar to *Flynn*, "had the omitted projections been made, [the court] is confident that plaintiffs would have asserted that such predictions lacked a reasonable basis and, accordingly, were actionable...." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 644 (3d Cir.1989). The facts of the instant case demonstrate this concern.

The defendants projected potential profits for the first year at some $14.1 million. In actuality, the year-end profits measured $1.3 million. This court surmises that had the plaintiffs not sold their interest, the present action would be one claiming the overly optimistic projection caused them to hold on to their interest. Placing a partner between the Scylla and Charybdis presented by the plaintiffs' view of fiduciary obligations is both unnecessary and unwise. Instead, all that is required is for the partners to make available the information upon which they rely. Any resultant work product generated is beyond the scope of the duty to disclose.

Given the general nature of partnership disclosure obligations, and considering the institutional bias against disclosure of soft information that existed in the decades leading up to and including the early 1980's, it becomes clear to the court that no reasonable jury could find that any fiduciary duty was breached by the defendants.

981–82. The duty to disclose in these cases stems from the securities laws, i.e., section 10b–5, and not the fiduciary duty between partners. Although this court is fully aware of the different factual positions of *Flynn* and the cases cited therein, nonetheless the reasoning relevant to disclosure of soft information has merit when deciding whether there is a fiduciary duty to disclose such information among partners.

**14.** Although this standard was announced in a securities case, this court finds the definitional

Additionally, assuming *arguendo* a fiduciary duty existed and was breached, judgment as a matter of law would be appropriate because the plaintiffs have failed to prove *either* materiality or reliance regarding the non-disclosed information.

### 1. Materiality

Although it is generally recognized that the fiduciary duty of disclosure is "particularly applicable" to situations involving the sale of a partnership interest to another partner, *see* 59A Am.Jur.2d *Partnership* § 437 at 461 (1987), the disclosure obligation extends only to "all material facts and information." *Id.* § 438 at 461.

The Supreme Court has held that an omitted fact is "material" if there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable investor." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Under this formulation of materiality, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 449, 96 S.Ct. at 2132; *see Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 639 (3d Cir.1989) (applying this standard regarding a future prediction).[14]

Because the question of materiality is "a mixed question of law and fact, involving ... the application of a legal standard to a particular set of facts ..." courts are generally reluctant to decide the question as a matter of law. *TSC Industries, Inc.*, 426 U.S. at 450, 96 S.Ct. at 2132–33. Therefore, "[o]nly when the disclosures or omissions are so clearly unimportant that rea-

parameters applicable. One court that has considered what constitutes a material fact in the partnership context stated that a "material fact ... [is] a fact which a reasonable person, under the same or similar circumstances, would attach importance to in determining his course of conduct or action." *Miller v. Miller*, 700 S.W.2d 941, 948 (Tex.Ct.App.1985). This standard is virtually identical to the Supreme Court's definition and contemplates consideration of the same elements when deciding materiality.

sonable minds could not differ should the ultimate issue of materiality be decided as a matter of law." *Craftmatic Sec. Lit.*, 890 F.2d at 641, *citing TSC Industries, Inc.*, 426 U.S. at 450, 96 S.Ct. at 2133; *Berg v. First American Bankshares, Inc.*, 796 F.2d 489, 495 (D.C.Cir.1986).

In this case, the plaintiffs have failed, as a matter of law, to demonstrate that the omitted facts were in any way material. The plaintiffs argue that a wealth of material information was withheld by the defendants, and that certain relevant facts were misleading. As best can be gleaned from the record and briefs submitted relating to this motion, the alleged breach of fiduciary duty centers on six issues. The two most important are: (1) the defendants' withholding of the Boxer financial projection, and (2) the defendants' concealment of the availability of $3.087 million dollars from the Midlantic loan. These issues will be treated below, and the remaining four will be addressed in the following section.

### a. *The Boxer Report*

■ Much is made in plaintiffs' case of the "Boxer Report," a 35 year financial projection that the plaintiffs did not receive prior to the buy-out transaction. *See* Plaintiffs' Brief in Opp. at 50–56. The Boxer Report is a report of the "[p]resent value of 100% of Marina's anticipated future cash flows...." Exh. 734. The report also contains two ten-year projections, a "low case" and a "middle case," which anticipate the future performance of the Marina project. *See* Exh. 734 at 124–31. In both cases, the projected net operating profit is substantial.[15]

The gravamen of plaintiffs' allegation regarding the Boxer Report is that, had they been aware of the projection, they would have realized the value of their interest and would not have sold. They claim the defendants' failure to disclose the projection constituted a breach of fiduciary duty. *See* Plaintiffs' Brief in Opp. at 52–54.

Standing alone, the plaintiffs' allegations surrounding the projection could have some merit. However, in light of the disclosure exception discussed *supra*, and in light of the overwhelming evidence showing that the plaintiff benefitted from full disclosure of material information, the claim must fail as a matter of law.

The hotel/casino opened for business on November 22, 1980. The May 5, 1981 Boxer Report contained projections which were prepared in January of 1981. These projections were based on the past performance of the property, as well as the knowledge and expertise of the compiler, Mike Regan.[16] *See* Trans. at 3249–50.

It was established at trial that the plaintiffs were in receipt of the financial statements for the marina project from the time of opening until the buy-out. *See* Exhs. 1004.01–.09. The plaintiffs also received all the loan advance schedules, *see* Exhs. 1015.01–.14, the "Daily Flash Revenue Reports," *see* Exhs. 1008.01–.15, and detailed financial statements which included balance sheets, statements of pre-opening and operating expenses, and changes in the financial position of the project. *See* Exhs. 1004.01–.09; Trans. at 6722–59.

---

**15.** The "low case" shows a net operating profit over ten years to be $199.738 million. The "middle case" forecasts net operating profits of $242.282 million. *See* Exh. 734 at 127, 131.

**16.** Regan testified regarding the preparation of the January forecasts as follows:

At that point in time, as I recall putting [the forecasts] together, it was, it was my guess....

....

I was given the task of putting a ten-year plan together. I had been in the business for five months. We were operating as a casino in a part of Atlantic City that was—was eight miles, or whatever, from the Boardwalk in a

totally untried environment. We didn't have the foggiest and I couldn't call ... anybody and get any wisdom on. They didn't know. I didn't know.

I mean, I just took a shot at it....

I remember doing [the forecasts] in a very short time frame.... As far as I was concerned, it was just take it, wing it out there and see what happens....

Trans. at 3200–01. The actual Boxer Report, which was prepared in May, 1981 by Patterson, relied on these January projections. Patterson indicated that the only assumption he changed was related to interest rates. *See* Trans. at 3820–24, 3966–70.

In essence, the plaintiffs are arguing the breach stems from the defendants' failure to disclose the result of the processing and re-formulation of this disclosed information.[17]

However, the plaintiffs have failed to demonstrate how the Boxer Report itself would have affected the "total mix" of information available. *See TSC Industries*, 426 U.S. at 449, 96 S.Ct. at 2132. The testimony at trial revealed that the preparers of the forecasts had little, if any, experience in making forecasts in the gaming industry. *See* Trans. at 11734–47, 3200. The record is rife with testimony indicating that the report was, at best, a guess, with some bold assumptions included. As Ms. Bradshaw–Dwyer stated, "[t]here wasn't a lot of data that went into developing the long range forecast at that time. There didn't exist a lot of data to develop it.... [F]orecasting in Atlantic City at the time was very difficult...." Trans. at 1823–24.

Plaintiffs argue, however, that had they been aware of the projections, they would have placed greater reliance on them and might not have sold. What the plaintiffs overlook is the fact that they had tremendous amounts of information in their possession. *See, e.g.,* Exhs. 1433 & 1434 (indicating that the plaintiffs had two other projections prepared by the defendants which showed considerable profits; Exhs. 1178 & 1182 (reports prepared by Dean Witter regarding the project, including projections that show considerable profits over a five year period).

Based on the volume of information in the possession of the plaintiffs, it stretches the imagination to suggest that a reasonable jury could find that the Boxer Report would have affected the reasonable partner's decision to sell his interest. The Boxer Report is a mere reiteration of much that had been projected already; the project was going to perform well at some point, but the actual realization of profits by the partners might not occur for some years.[18] Based on the risks and concerns regarding the property, and based on the plaintiffs' fears of being diluted,[19] the partners agreed to a sale. Placing the reasonable investor in the plaintiffs' shoes, the court finds that the Boxer Report was immaterial as a matter of law.

The plaintiffs' have also failed, as a matter of law, to demonstrate that they would have relied on the projection had they seen the completed report.

Throughout the trial there was much discussion regarding the importance of financial projections. There is evidence showing that prior to the commencement of the Marina project, the plaintiffs commissioned a study of the proposed hotel by an independent accounting agency, Laventhol & Horwath. *See* Exh. 1107; Trans. at 7418–22. The plaintiffs were also in possession of two 10–year projections prepared by the defendants in May and July of 1979. *See* Exhs. 1433 & 1434; Trans. at 7435–46.[20]

---

**17.** As discussed *supra,* the duty is satisfied if the party with facts regarding the partnership makes that information available to other partners. *See, e.g.,* H. Reuschlein & W. Gregory, Handbook on the Law of Agency and Partnership, § 189, at 280 (1979) (citation omitted) (noting that "[f]acts, such as that appearing on the firm books, to which all the partners have equal access need not be divulged....").

**18.** Plaintiff Sturman testified that he believed it would be "three, four or five years before significant cash would be thrown off to the partners...." Trans. at 7752–55. The cash would not be immediately forthcoming because other debts had priority, including some $35 million due a loan to the project advanced by Bayfield. *Id.* at 7756. As Sturman indicated in his deposition, such a time frame was "too long to wait." *Id.* at 7754.

**19.** Plaintiffs' interest in the hotel was diluted and would be further diluted because of their failure to contribute their share of the Project Development Budget Shortfalls as per the June 6, 1980 Memorandum of Understanding. *See* Def's. Brief in Supp. at 114, n. 311.

**20.** Exhibit 1433 is a ten-year projection that includes a "most likely case" scenario and a "downside case" scenario. The "most likely" projection estimates yearly net operating profit for year 01 at $29 million, and $69 million for year 10. The ten year total net operating profit is projected at over $490 million. The "downside case" estimates yearly profits to range between $5 million to $20 million a year. The ten-year total net operating profit projected by the downside case is $121 million. *See* Exh. 1433. Plaintiffs readily concede that exhibits 1433 & 1434 were in their files. *See* Trans. at 7433–40.

In addition to these projections, the plaintiffs also had updated financial forecasts prepared by the Laventhol & Horwath company, *see* Exhs. 1128, 1129, 569; Trans. at 7424–25 and they had an appraisal that contained forecasts from Robert Sapio, an expert in doing real estate appraisals.[21] *See* Exh. 1149; Trans. at 7425–26.

In spite of the plethora of forecasting information, the record contains numerous references showing the plaintiffs' general aversion towards financial projections. Lou Walter, when given a projection for the year at the March, 1980 Executive Committee meeting characterized the forecasts as mere "guestimation," and indicated that the predictions were not "factual." *See* Trans. at 8169–70.

The record also reflects that Lou Walter felt forecasts were "really inane and big company bureaucracy ..." and that he "expressed disdain of [sic] the quality of forecasts." Trans. at 1477–78; 1199.

Herb Sturman indicated that when the plaintiffs were looking to sell their interest, the Laventhol & Horwath projections would not be relied on by the prospective buyers because the forecasts were "ancient history." *See* Trans. at 6506–10. The reports, prepared on June 25, 1980, were less than one year old when tagged with this label. Sturman also testified that the projections prepared by Laventhol & Horwath and Sapio were of little importance to him and that he "did not have to [sic] much confidence in the projections he had seen...." Trans. at 6518–19.[22]

Compounding the problems and general concerns the plaintiffs held regarding projections is the importance that could rea-

sonably have been placed on the projection by the plaintiffs had they seen them. As the Third Circuit discussed in *Flynn v. Bass Bros. Enterprises, Inc.*, 744 F.2d 978 (3d Cir.1984), there are certain factors to be weighed when determining the value of soft information.[23] These factors are "[1] the facts upon which the information is based; [2] the qualifications of those who prepared or compiled it; [3] the purpose for which the information was originally intended; [4] it's relevance to the ... impending decision; [5] the degree of subjectivity or bias reflected in its preparation; [6] the degree to which the information is unique; and [7] the availability ... of other more reliable sources of information." *Id.* at 988 (citation omitted).

Of these factors, the first, second, third, sixth and seventh all militate against a finding of materiality of the undisclosed Boxer Report.

The testimony of Katie Bradshaw–Dwyer and Mike Regan indicated that the newly formed "Planning and Analysis Department" of the defendants' company was comprised of individuals with little experience in the field of forecasting and with little exposure to the gaming industry. *See* Trans. at 1734–47; 3158–61. Regan, the individual who prepared the financial projections upon which the Boxer Report was based, had only five months experience in the business of forecasting. *See* Trans. at 3200. Mr. Regan testified that when he was preparing his projections, the numbers he used were a "combination of guess, [and] wishful thinking." *Id.* Mr. Regan testified further regarding his projections that he "remember[ed] doing [the

---

**21.** Sapio indicated that the market value of the project was $350 million.

**22.** Sturman indicated in a memo to file, dated May 23, 1980, that in a meeting between the plaintiffs and defendants, there was a "discussion ... with respect to the various projections pertaining to operations of Marina. Salmonson [sic] indicated that Patterson was projecting $12,000,000.00 after taxes in the first year of operation, while Haybert was projecting $31,-000,000.00 after taxes. The major difference in the projections pertains to the win in casino. Lou Walter suggested that we hire an independent third party to provide us with manageable

and independent projections. All parties agreed." Exh. 1046.09 at 2. This independent projection was never commissioned by the plaintiffs.

**23.** This court does not hold, by referencing the *Flynn* factors, that the reasoning of the Third Circuit's opinion applies directly to the duty to disclose as between partners. However, to the extent that both the *Flynn* case and the instant action relate to disclosure of "soft" information, the *Flynn* factors do serve as an appropriate guide in helping a court measure the materiality and value of projections and other soft information.

projection] in a very short time frame. [He] didn't have a whole lot of time to go out and solicit advice and opinion[s] of different people and, as far as I was concerned, it was just a take it, wing it out there and see what happens." Trans. at 3201. *See also* Trans. at 3207 (noting that this was the first time Mr. Regan had prepared anything like a long term forecast). This testimony indicates that the qualifications of the preparers of the forecasts supporting the Boxer Report were anything but exceptional.

The uniqueness of the information is a non-issue because, as discussed *supra*, both partners were in possession of the raw data relied upon by Mr. Regan. *See* Exhs. 1015.01–14; 1009.01–08; 1008.01–.15; 1014.01–.06; 1004.01–.09. That other more reliable information was available to the plaintiffs is evidenced by their continued relationship with Laventhol & Horwath. Moreover, the purpose of the Boxer Report, as determined by Magistrate Judge Simandle and affirmed by this court, was to aid the defendants during the buy-out negotiations. *See* Dkt. No. 85–4833 Letter Opinion and Order (Apr. 27, 1990) (per Magistrate Judge Simandle), *aff'd*, Dkt. No. 85–4833 (Mar. 25, 1991 Order).

It appears then, in considering all of the evidence available to the plaintiffs, the duties of disclosure applicable, the materiality of the Boxer Report, and the evidence regarding reliance, that no reasonable jury could find the non-disclosure of the Boxer Report amounted to a breach of fiduciary obligations by the defendants.

### b. *The $3.087 Million*

 Plaintiffs contend that a breach of the fiduciary duty can be found by the defendants' failure to disclose the availability of $3.087 million which was not drawn down on the Midlantic loan. Plaintiffs suggest that even though the fact that the money was not drawn down could have been deduced from the documents, the defendants nonetheless had an obligation to disclose that the "hold-back" provision of the loan agreement had been waived by the bank.[24] *See* Plaintiffs' Brief in Opp. at 32.

The testimony at trial, however, reveals that the plaintiffs were indeed in possession of the information relating to the draw-down and also had knowledge of Midlantic's waiver of the hold-back provision.

Lance Walter testified that Mr. Haybert sent him monthly financial statements which included, *inter alia*, a section indicating how much money was still available for the Marina project. *See* Trans. at 6764–65; Exhs. 1004.03–.04. Mr. Walter also acknowledged that this information showed the exact amount of money that had not been drawn down on the bank loan. *See* Trans. at 6764–65. Further, Mr. Sturman testified that he had seen the second loan modification agreement,[25] including

---

**24.** The loan agreement between Midlantic and Marina Associates provided that the final advance of the loan would not be made until certain conditions were met. These conditions included a certificate of completion by the architect and a permanent certificate of occupancy from appropriate government agencies. *See* Exh. 1003.02 at 62–63. This section of the loan agreement, dubbed the "hold-back provision," is apparently a common feature of construction loans.

**25.** The Second Loan Modification Agreement negotiated with Midlantic provided, in pertinent part,

WHEREAS, the project is now substantially complete and is presently operating as a hotel/casino under a temporary certificate of occupancy and temporary casino permit issued by the appropriate Governmental Authorities; and

WHEREAS, Borrower has submitted to Lender a Requisition for the final advance of the

Loan in the amount of Three Million Eighty-Seven Thousand Five Hundred and Eighty-Seven Dollars and Fifty cents ($3,087,587.50); and

WHEREAS, Section 6.22 of the Loan Agreement, as revised by the Loan Modification Agreement, states that Lender's obligation to make the final advance of the Loan is conditioned upon Lender having received from Borrower prior to the final advance, those certain set forth in said Section 6.22; ....

....

NOW, THEREFORE, in consideration of thee premises and the mutual covenants and representations hereinafter set forth, the parties hereto mutually covenant and agree as follows:

....

6. Article VI of the Loan Agreement entitled "ADVANCEMENT PROCEDURES", is hereby modified in the following manner:

....

the section regarding the release of the remaining $3.087 million on the loan. *See* Trans. at 7381–83. Indeed, prior to executing the second loan modification agreement, Mr. Sturman met with the other plaintiffs to review the proposed modification. *See* Exh. 1001.32. In the minutes of this special meeting, Mr. Sturman indicates "[a]ll of the directors [the plaintiffs] acknowledged to each other that they had reviewed the second loan modification documents and that if approved that it would be in the best interests of all concerned if said documents were executed." Exh. 1001.32 at 2.

The plaintiffs argue, however, that Midlantic's decision to release the remaining funds was made in January, 1981, but was never communicated to them by the defendants. *See* Brief in Opp. at 31–32. Although the plaintiffs do not direct the court to evidence indicating how or by whom Midlantic's decision was communicated to the defendants, its importance is immaterial when subsequent events are considered.

Apparently, some time in mid-February, prior to the buy-out, the defendants requested the additional $3–plus million to be drawn down. *See* Exh. 672 at 1. This request was rejected by the bank. *See id.* at 1. As Exhibit 672 indicates, because of the significant cost overruns on the project, "[the bank] concluded that it would be inappropriate to advance the last disbursement with [a] significant cloud over the company's picture...." *Id.*

It is clear, then, contrary to plaintiffs' assertion, that the bank was unwilling to waive the hold-back provision of the loan agreement in early 1981. Any possible significance attributable to the bank's position in January of 1981 is rendered moot by the

bank's subsequent reversal and refusal to release the money in February of 1981 without a renegotiation of the loan agreement. The plaintiffs were fully aware of the renegotiation regarding the release of the remaining $3.087 million. Arguments to the contrary are simply that—arguments, which are refuted by the testimony and the record evidence. Therefore, no reasonable jury could find that the defendants breached their fiduciary duty as it relates to the hold-back provision.

**D. *Fiduciary Duty Part III***

There appear to be four remaining allegations regarding a breach of fiduciary duty. These are: (1) the "cash-call strategy" designed to squeeze the plaintiffs out of the partnership; (2) the statements by the defendants that Midlantic was not interested in refinancing the project; (3) the defendants' alleged lack of interest in buying the plaintiffs' shares; and (4) the failure of the defendants to disclose their own culpability regarding the mismanagement of the project. These contentions will be treated in *seriatim.*

**1. Inflated Cash Call Strategy**

Plaintiffs contend that the defendants made "demands" for money, or cash calls, which were inflated in an attempt to squeeze the plaintiffs out of the partnership. *See* Brief in Opp. at 28–31. Plaintiffs argue that once the defendants realized the actual amounts needed for the project were less than "demanded," a duty arose to so inform them. *See id.* at 30–31. This contention can be disposed of on a number of grounds.[26]

Mr. Sturman acknowledged that the cash calls were made on an "as needed" basis.

---

L4) In Section 6.22 delete reference to the following:
"(a) Evidence satisfactory to it, that the project has been satisfactorily completed substantially in accordance with the Plans and Specifications, and
(e) A permanent certificate or certificates of occupancy covering the entirety of the Premises and the Project and issued by each appropriate Governmental Authority subject, however, to the gaming permits necessary from the Commission evidencing that all

work requiring inspection by municipal or other governmental authorities having jurisdiction has been duly inspected and approved by such authorities";
....

**26.** The present discussion is addressed solely to the issue of a fiduciary duty to disclose the information. To the extent that this issue relates to fraud, the jury has answered by finding in the defendants' favor.

*See* Trans. at 7284–7300.[27] Mr. Sturman was also in possession of a letter from Mr. Chapman indicating that the cash calls would be required "as they occur." *See* Exh. 1245 at 1.

The plaintiffs do not challenge the validity of the cash calls *actually* made. In addition, they did not produce testimony of those charged with the oversight responsibility for the actual construction of the hotel/casino or those who created the figures for the cash calls, including Walt Haybert, who was the Chief Financial Officer of Marina Associates. Instead, they argue that because the eventual cash calls "only" reached $24.8 million, and because the defendants never "modified" the original requests to reflect this change, there was incomplete disclosure and therefore a breach of fiduciary duty.[28]

The most direct answer to this claim is that there is absolutely *nothing* in the record to support the contention that the defendants intentionally or recklessly made the cash call projections. The only support for this contention is the fact that, when the project was completed, it ultimately did not cost as much as the defendants anticipated. But this difference, determined *post facto*, cannot support a claim for breach of fiduciary duty. Plaintiffs point to no other evidence in their brief to support the position. Therefore, no reasonable jury could find that the defendants violated their fiduciary obligations regarding the cash-call requests.

27. Sturman reluctantly acknowledged that "as money was being spent, [the plaintiffs] were getting additional letters saying, now, here is the amount we need today...." Trans. at 7300.

28. In a Memorandum prepared by Herb Sturman on October 25, 1978, Sturman indicates that he has reviewed the partnership agreement with the principals. *See* Exh. 1043 at 1. The Memorandum recites, in part,

I discussed with [the principals] ... the initial capital contribution. In particular, Section 3.1 provides that each party shall initially contribute the sum of $2,000,000 in cash. The oral understanding between the parties is that $1,000,000 would be initially contributed and that the remaining $1,000,000 will be contributed on a prorata basis as and when needed. The agreement, however, is contrary to this as

## 2. Midlantic's Interest in Refinancing the Project

■ Plaintiffs argue that the defendants breached the fiduciary duty by falsely representing Midlantic's position regarding refinancing of the Marina project. Specifically, plaintiffs allege that Solomonson explicitly misrepresented Midlantic's position at the March 18th Executive Committee meeting by advising the members that Midlantic was not interested. *See* Plaintiffs' Brief in Opp. at 37. From this, plaintiffs argue they were entitled to conclude that Solomonson had "specifically asked Midlantic to provide additional exculpatory financing, and that Midlantic had explicitly told him that it was not interested in providing any such additional financing." However, Mr. Placke, a vice-president of the bank in charge of corporate financing, testified that he had no recollection of Solomonson asking "Will you lend us money?" Thus, Solomonson was not withholding any information which he had a duty to divulge. If, indeed, the statements were false and misleading they would be actionable for fraud, not breach of fiduciary duty. Obviously, if there was a misrepresentation, the plaintiffs may be able to demonstrate this to the jury.

## 3. The Defendants' Interest in a Buy–Out

■ Plaintiffs contend that the defendants breached the fiduciary duty by representing to plaintiffs that they were not interested in buying plaintiffs' 50% share.

it states that each should initially contribute $2,000,000. After discussing the matter, we decided that we would be better off to remain silent on this point.... In order to avoid an issue, silence seems to be appropriate. *Id.* at 2. Later in the same Memorandum, Sturman indicates that "[a]s a consequence of the construction of the agreement, there is a gap.... I believe that we are better off by leaving the gap in the agreement." *Id.* at 3. Obviously, the amounts of money required for the initial and overall costs of the project and the parties' obligations with respect to them were subject to some interpretation. These ambiguities were foreseen by the plaintiffs, but were concealed with the hope of gaining some future advantage. *See* Trans. at 7565–66.

*See* Brief in Opp. at 56–58. According to plaintiffs, this false statement further induced them to sell. They argue that this failure to disclose the interest in buying their share constituted a breach of fiduciary duty. Again, this issue presents a question of fraud rather than a pure breach of fiduciary duty. Obviously, a breach of fiduciary duty and fraud are intertwined with this type of claim. However, this question is properly directed to a jury determination of whether a fraud was perpetrated.

### 4. Failure to Disclose Mismanagement

██ Plaintiffs next argue that a breach of fiduciary duty occurred when the defendants failed to disclose their own "incompetent, foolish and inefficient decisions ..." regarding project construction. They argue had defendants disclosed that the cost overruns were due to mismanagement, "[t]he plaintiffs would have had a negotiating basis, and quite likely a legal ground, to resist [the defendants'] dilution threats, and to induce or require [the defendants] to bear the extra cost entirely, or at least to advance the necessary funds to cover it...." Brief in Opp. at 46–47.

To the extent that this claim alleges a breach of fiduciary duty involving federal securities law, it is not actionable as a matter of law. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476–79, 97 S.Ct. 1292, 1302–04, 51 L.Ed.2d 480 (1977); *see also Craftmatic Secur. Litig. v. Kraftsow,* 890 F.2d 628, 638–39 (3d Cir.1989) (noting that "claims essentially grounded on corporate mismanagement are not cognizable under federal law" (citation omitted)); *Panter v. Marshall Field & Co.,* 646 F.2d 271, 288 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (shareholders cannot "bootstrap" a fiduciary duty claim onto a federal securities section 10(b) violation alleging non-disclosure of culpability).

To the extent that the plaintiffs allege a breach of fiduciary duty between partners to disclose mismanagement, their proofs also fail as a matter of law.

The plaintiffs suggest that had they been aware of the defendants' culpability regarding project cost overruns, they would have been able to resist threats of dilution. *See* Brief in Opp. at 46–47. The argument misses the mark on a number of grounds.

First, the Transaction Audit Review Report, an exhibit upon which the plaintiffs rely, was not completed and presented until May 15, 1981, several days after the buyout agreement had been reached. *See* Exh. 749. Plaintiffs concede this, but argue that "the jury is entitled to conclude that the essential findings were known, at least to Norville (the leader of the group) long before the buy out." Brief in Opp. at 47.

It is of no surprise that the plaintiffs cannot support this statement, because it is insupportable from the record. The plaintiffs have offered no evidence tending to prove that the defendants were aware of the findings but intentionally withheld the results.

There is evidence indicating that the defendants alerted the plaintiffs of the audit. Exhibit 686, a letter from Mr. Ellis to Mr. Sturman reads, in part, "[w]e have been conducting an audit of the construction phase of the project development, and of course that phase is not yet over...." Exh. 686 at 2. Earlier in the same letter, Mr. Ellis writes "[y]ou are welcome to come in and audit the books anytime you wish.... Tell us what you want, when you want it and how you want it and we will do our best to comply...." *Id.* at 1. Hardly the talk of artful dodgers and scheming traitors.

In any event, the plaintiffs cannot rest on the hope that the jury will not believe the record evidence and therefore spin a web of under-handedness which entangles the defendants. *Cf. Northeast Women's Center, Inc. v. McMonagle,* 670 F.Supp. 1300, 1303 (E.D.Pa.1987) (observing that, pursuant to Rule 50(a), "[t]he mere fact that a scintilla of evidence supports the plaintiff's case will not defeat a motion for a directed verdict...."); 9 Wright & Miller *Federal Practice & Procedure* § 2527 at 563 (1971) (noting that "[t]he party with the burden of proof does not make an issue

for the jury by relying on the hope that the jury will not trust the credibility of the witnesses. If all of the witnesses deny that an event essential to plaintiff's case occurred, he cannot get to the jury simply because the jury might disbelieve these denials. There must be some affirmative evidence that the event occurred." (footnote omitted)).

As the Tenth Circuit noted, where a case is comprised of "mere inference upon inference, such as would dictate a jury verdict based upon pure speculation, ..." it is proper for the court to direct the verdict. *Brown v. Reardon,* 770 F.2d 896, 904 (10th Cir.1985). Evidence that is based upon "mere conjecture, speculation, or surmise ..." should not survive a motion for directed verdict. *Id.* at 904. *See also Zenith Radio Corp. v. Matsushita Elec. Indust. Corp.,* 513 F.Supp. 1100, 1171 (E.D.Pa. 1981) (noting that mere speculation is insufficient to withstand a motion for directed verdict); *Toomey v. Danaher,* 161 Conn. 204, 286 A.2d 293, 297 (1971) (observing that inferences drawn from facts must be logical, and not the result of guess, conjecture or speculation).

Further, plaintiffs have failed to produce evidence to show that Lou Walter did not have knowledge of the source of the mismanagement. The evidence shows that Lou Walter was involved in day to day management of the project. In fact, there is evidence indicating he was the *de facto* head of construction. Yet he never took the stand to refute this evidence.

In this case, there is neither the requisite level of evidence above the scintilla, nor is there any evidence to support the inferences the plaintiffs wish to draw. Therefore, judgment as a matter of law is proper on this issue.

### E. *Fraud and Punitive Damages*

■ The issue remaining to be addressed at this time is whether or not the fraud claim can go to the jury. Viewing the entire record, there appears to be the minimum amount of evidence required to overcome a judgment as a matter of law regarding plaintiffs' two fraud claims. However, the defendants' motion for judg-ment as a matter of law regarding the award of punitive damages will be granted.

Plaintiffs' claim for punitive damages is governed by New Jersey law. In *Nappe v. Anschelewitz, Barr, Ansell, & Bonello,* 97 N.J. 37, 49, 477 A.2d 1224 (1984), the New Jersey Supreme Court wrote

[t]o warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an "evil-minded act" or an act accompanied by a wanton and wilful disregard of the rights of another.

(citations omitted). The court held further that "punitive damages may be assessed for an intentional tort involving egregious conduct...." *Id.* at 51, 477 A.2d 1224.

In this case, there is no evidence to support an award of punitive damages. Although the court in *Nappe* noted that "it is especially fitting to allow punitive damages for actions such as legal fraud, ..." *id.* at 50, 477 A.2d 1224, the court did not make such a direct holding. As the court discussed, a person defrauded may be entitled to vindicate his rights through an award of punitive damages "in *appropriate* cases to punish the defendant...." *Id.* at 53, 477 A.2d 1224 (emphasis added).

As Justice O'Hern noted in his concurring opinion:

[t]he majority says "it is especially fitting to allow punitive damage [sic] for actions such as legal fraud...." But the Court shies away from adopting a rule that in cases of fraud, punitive damages may always be awarded....

*Id.* at 61, 477 A.2d 1224 (O'Hern, J., concurring).

That punitive damages are not awarded in every case is also consistent with other states within this circuit. The Third Circuit, in *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715 (1991), applying Pennsylvania law, overturned a jury award of punitive damages in a fraud case. The Circuit observed

"fraud is not alone a sufficient basis upon which to premise an award of punitive damages.... If the rule were oth-

erwise, punitive damages could be awarded in all fraud cases. That is not the law. The rule, rather, is that for punitive damages to be awarded there must be acts of malice, vindictiveness and a wholly wanton disregard of the rights of others."

*Tunis Bros.*, 952 F.2d at 740–41, *quoting Smith v. Renaut*, 387 Pa.Super. 299, 309, 564 A.2d 188, 193 (1989). *Cf. Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 471 (3d Cir.1990) (holding that a judgment notwithstanding the verdict dismissing a punitive damages award was proper where there was "no evidence of outrageous conduct or willful disregard for [plaintiff's] rights....").

Notwithstanding assertions to the contrary, the evidence presented can not support a finding of "evil-minded" motives on the defendants' part. The plaintiffs attempt to spin a web of intrigue and nefarious dealing in their brief in opposition. They write:

> [T]he fraud that was perpetrated by defendants in this case did not take place on a single day or in a single meeting or conversation. Instead, it was an elaborate, multi-faceted scheme to squeeze the plaintiffs and pressure them psychologically into selling their interest in the Marina to defendants for a tiny fraction of its value, which was carefully orchestrated by Ed Ellis at the direction of his "client," Mike Rose, and with the assistance of many Holiday officers and representatives over a period of several months.

Plaintiffs' Brief in Opp. at 23–24.

Despite the plaintiffs' best efforts to embellish the record in an attempt to portray the defendants as orchestrating a sinister scheme, the plaintiffs can point to no affirmative evidence which would support a jury finding of an "evil mind" on the part of defendants. There is no evidence to suggest that the defendants engaged in conduct that exhibited a "wanton" disregard for the plaintiffs' rights.

Therefore, the defendants' motion for judgment as a matter of law regarding punitive damages will be granted.[29]

## IV. CONCLUSION

Plaintiffs' proofs and selection of witnesses makes this case appear to be an effort to establish violations of important principles of law by using today's memory while ignoring yesterday's facts. Based on the foregoing, the defendants are entitled to Judgment as a Matter of Law on all claims but fraud.

---

**29.** The jury ultimately found that the evidence did not support a finding of fraud, regardless of the state of mind required.