192 N.J. Super. 213 (1983)
469 A.2d 531
ARTHUR H. FRAVEGA AND MARY S. FRAVEGA AND JAMES L. BOURGEOIS AND EILEEN BOURGEOIS, PLAINTIFFS,
v.
SECURITY SAVINGS AND LOAN ASSOCIATION, A SAVINGS AND LOAN ASSOCIATION DOING BUSINESS IN THE STATE OF NEW JERSEY, AND MULTI-SERVICE CORPORATION, ITS SUBSIDIARY, A CORPORATION OF THE STATE OF NEW JERSEY; AND RONALD SEAGRAVES; JOHN KELLY AND BART SPEZIALI, INDIVIDUALLY AND IN THEIR CAPACITIES AS OFFICERS AND EMPLOYEES OF MULTI-SERVICE CORPORATION AND/OR SECURITY SAVINGS AND LOAN ASSOCIATION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division Cape May County.
Decided October 14, 1983.
*216 Willis F. Flower for plaintiff (Ford & Flower, attorneys).
Michael J. Gruccio for defendants (Milstead & Ridgway, attorneys).
GIBSON, J.S.C.
This action requires an interpretation of the recent amendment to the lis pendens statute, N.J.S.A. 2A:15-7. Plaintiffs' suit seeks to set aside certain conveyances of real estate which they claim defendants procured by fraud and on terms which render them unconscionable. Notices of lis pendens were filed concurrently with the action and defendants now move to have them discharged. Raised by this motion are questions of procedure and substance which do not appear to have been resolved by any reported decision.[1]
N.J.S.A. 2A:15-7 was amended on December 13, 1982 and became effective 60 days thereafter. As indicated by the legislative history it was passed in response to a concern over the lack of procedural safeguards in the previous statute as well as its possible constitutional deficiencies. See Chrysler Corp. v. Fedders Corp., 519 F. Supp. 1252 (D.N.J. 1981), rev'd 670 F.2d 1316 (3 Cir.1982); United S. & L. Ass'n. v. Scruggs, 181 N.J. Super. 52, 58-59 (Ch.Div. 1981); Senate Judiciary Committee Statement *217 to Substitute for Senate Bill 918 (1982).[2] Under the amendment, the obligations and remedies which attach upon the filing of a notice of lis pendens vary depending on the nature of the claim. For example, if plaintiff's claim arises out of a written instrument which appears of record or one which was executed by the defendant and identifies the real estate, there are no procedural changes and anyone seeking a discharge is left to the same remedies as had previously existed; that is, awaiting a decision on the merits or moving for a determination that the action is one for damages only.[3]See Polk v. Schwartz, 166 N.J. Super. 292, 298 (App.Div. 1979). In all other cases, plaintiffs are now required to serve copies of the notice of lis pendens and complaint upon defendant within three days of filing, following which any party affected may move to discharge. In the event of such an application, the determination of the court will depend on "whether there is a probability that final judgment will be entered in favor of the plaintiff sufficient to justify the filing or the continuation of the notice of lis pendens." N.J.S.A. 2A:15-7(b). It is plaintiff's burden to establish such probability. Ibid. It is this latter section of the statute which forms the basis of defendants' application here.
The initial questions raised by this motion are procedural. The first involves the nature of the hearing and whether affidavits or live testimony are required; the second is whether the court is required to weigh the competing proofs or accept the plaintiffs' proofs as true, such as in the case of a motion on the pleadings. R. 4:6-5; R. 4:46. Although the statute does not speak directly to these issues, a recent rule amendment makes it clear that such a motion is to be determined on the pleadings, *218 affidavits and "testimony taken by leave of court...." R. 4:63A (effective Sept. 12, 1983); see also R. 1:6-6. As to the framework within which the proofs are to be examined, both the statute and the court rule appear to contemplate an evaluation of the proofs as opposed to an acceptance of pleadings as true. By couching the standard in terms of probabilities, N.J.S.A. 2A:15-7(b), and allowing cross-examination in those instances where testimony is permitted, R. 1:6-6, it seems clear that the court must engage in a weighing process regarding the persuasiveness of the proofs presented. The fact that the statute speaks in terms of burden of proof is further support for such a conclusion.
On a substantive level, the framework within which the proofs are to be evaluated has changed and, as indicated, the statute now requires that plaintiff show that there is a "probability that final judgment will be entered in favor of plaintiff sufficient to justify the filing or continuation of the notice of lis pendens." N.J.S.A. 2A:15-7(b). Although there are no reported cases which have yet interpreted this language, the legislative history and the prior case law make it clear that the purpose of the statute was to prevent the unfair use of lis pendens which creates a hardship on the owners of real estate where the alleged interest in the property is uncertain or problematical. See BJI Corp. v. Larry W. Corp., 183 N.J. Super. 310 (Ch.Div. 1982); Senate Judiciary Committee Statement, supra. As was pointed out in describing the impact of the former statute, the very filing of a notice of lis pendens "destroys the ability of a property holder to convey marketable title if the litigant has any possibility of success." Emphasis supplied. Chrysler Corp. v. Fedders Corp., supra at 1260. Clearly then, by couching the burden in terms of "probability" rather than possibility the Legislature intended to elevate the standard by which plaintiffs' proofs would be measured.
The word "probability" has been defined as "the quality or state of being probable". Webster's Third New International *219 Dictionary (1971) 1806. "Probability" may also be used in the statistical sense; that is, as a way of expressing the relative frequency of an event. Ibid; see also Random House Dictionary of the English Language (Unab. ed. 1967) 1146. The word "probable" is defined as "that [which] can reasonably and fairly convincingly be accepted as true, factual or possible without being undeniably so." Ibid. The utilization of the word "probability" by the drafters of the statute, while not compelling, supports the view that what was intended was that the court uphold the filing of the notice of lis pendens in those situations where the proofs establish that it is probable or more likely than not that judgment will be entered for the plaintiff. On the other hand, it may be argued, as do plaintiffs, that the "more probable than not" standard is no different than a "preponderance of the evidence" and that standard was considered and rejected by the drafters of this statute.[4] It is true that the language in the original bill was couched in terms of "preponderance of the evidence" as opposed to "a probability that final judgment will be entered" etc. Contrary to the position plaintiffs urge, however, that history cannot be read to support a requirement of only a "minimal" showing by plaintiff in this setting. To read the statute in such a fashion would strip it of all substantive change. Cf. Polk v. Schwartz, supra. More logically, the explanation for the change lies in the coupling of the word "probability" with the phrase "sufficient to justify the filing or continuation of the notice...." The Legislature appears to have chosen a standard which, although couched in terms of probability instead of possibility, requires the court to weigh the strengths of plaintiffs' case against the detriment imposed on defendant by reason of the filing of the notice of lis pendens. Such a weighing does not necessarily mean that plaintiff is relieved of showing that success on the merits is more probable than not; rather it would depend on the circumstances *220 of each particular suit and would obviously vary from case to case.[5]
Although the above approach may sometimes pose difficulties in application, it appears to be the fairest reading of the statute. Any reading of the amendment which neglects to take into account the impact of the phrase "sufficient to justify the filing ..." must assume that language to be superfluous. The normal rules of statutory construction require the opposite conclusion. Fiscella v. Nulton, 22 N.J. Super. 367, 372 (App.Div. 1952). Nor is this approach without precedent. A similar weighing process is involved when the court evaluates the appropriateness of the issuance of preliminary restraining orders.
Turning now to the evidence presented here, proofs were submitted by way of competing affidavits and live testimony from one of the plaintiffs. Based on that submission, the following preliminary findings may be made.
During the late 1970's plaintiffs were involved in real estate sales and development in Cape May County, primarily in Sea Isle City and Ocean City. Certain of their projects were financed with construction money through the defendant, Security Savings & Loan Association (Security). As plaintiffs' successes increased, so did their relationship with Security, eventually developing to a point where various joint ventures were entered into between plaintiffs and Security's wholly owned subsidiary, Multi-Service Corporation (Multi-Service). The majority of the projects involved multi-unit condominiums.
Although the initial relationship between the parties was friendly and profitable, circumstances changed significantly about 1982. For a combination of reasons, mainly related to *221 high interest rates, the failing real estate market and cost overruns, plaintiffs experienced severe economic problems leading to extensive creditor claims which they could not satisfy. Although development financing continued to be advanced by Security, plaintiffs could not keep up with cash demands and began to apply monies specifically designated for particular projects to other projects. Even this, however, was not sufficient to solve their cash flow problems and plaintiffs' financial difficulties soon came to Security's attention as did the misappropriation of loan monies.
A series of meetings was subsequently held between the parties designed to solve their mutual problems including creditors claims against plaintiffs of about $600,000. Although the exact parameters of the agreement reached are unclear (there being no writing) it would appear that plaintiffs agreed to turn over to defendants title to all of the projects, including those in which Multi-Service was not a joint-venturer. In turn, Security agreed to pay off all of the creditors and to relieve plaintiffs of all outstanding loan obligations with the exception of a newly credited note for $660,000. As security for this note, defendant required mortgages against plaintiffs' residences and one other property. Plaintiffs argue that the agreement, once the numbers are examined, reveals that it was unconscionable and the result of fraud and duress by defendants. They also claim that their bargaining strength was undermined by a continuing fear that, if they did not agree to the bank's terms, they would be criminally prosecuted as a result of the misappropriation of loan monies, a fear which the bank encouraged.
During the period of the above negotiations, although plaintiffs were represented by independent counsel who was generally aware of what was happening, they chose not to have him participate except with respect to the closing of the new loan transaction. Plaintiffs testified that they were fearful that their attorney's participation might "rock the boat" and therefore they relied instead on defendant's promise to treat them fairly. By the time the closing on the loan was completed, *222 however, they came to the conclusion that, not only were they not being treated fairly, but that defendants were taking unconscionable advantage of them. In particular, they concluded (and now claim) that the values defendants assigned to the various properties were unreasonably low, that the loan itself should not have been necessary and that the problem has been compounded by defendants subsequent sales of the properties at below market value.
Although, given the nature of this proceeding, the findings on these claims must necessarily be tentative and subject to change following a plenary hearing, it is the present conclusion of the court that the proofs do not establish either unconscionability, fraud or a breach of fiduciary duty. Contrary to the plaintiffs' allegations, a close examination of the values assigned by defendants to the properties transferred, shows that they vary only slightly (approximately 3%) from those previously designated by plaintiffs. As to the "unconscionability" of the transaction, that must be viewed from the perspective of the very extreme economic circumstances then facing the parties, plaintiffs in particular. Aside from their admitted misappropriation of bank funds, plaintiffs were indebted to creditors in an amount exceeding $600,000. As a result of this transaction those liabilities were satisfied and the potential difficulties arising out of the misappropriation were eliminated. Plaintiffs alternatives were clearly limited. Continuing the projects appeared to be impossible. The carrying charges were quite heavy given the number of projects, the high interest rates and the slow market. Plaintiffs had no real prospect of sustaining that burden. Turning to the new loan, although the settlement charges appear high and the reservation of a $60,000 fund by the bank is suspect, the proofs as to that were not complete. However, since plaintiffs were clearly represented by counsel at that point they had ample opportunity to negotiate that item then. Finally, whether the additional loan was or was not necessary depends on the evaluation given to the various properties. *223 At this point, that issue has been resolved against plaintiffs.
Regarding the claim of fraud, plaintiffs have failed to adequately identify what conduct of defendants constitutes fraud except to suggest that they were promised fair treatment and did not receive it. One who alleges fraud must do so with specificity and the proofs must be convincing. Brown v. Brown, 28 N.J. Super. 165, 172 (App.Div. 1953). For the reasons already expressed with regard to the claim of "unconscionability", the evidence submitted thus far falls far short of that standard.
The proofs regarding a breach of fiduciary duty are similarly insufficient. Initially, it should be noted that the imposition of a fiduciary obligation in this setting seems questionable. Although a joint venturer, when acting within the scope of the common enterprise, admittedly has an obligation to act toward his coadventurers with utmost good faith, Stein v. George B. Spearin, Inc., 120 N.J. Eq. 169, 176 (Ch. 1936), that standard would not appear to logically extend to transactions where the relationship between the parties is, by nature, adversarial.
Whereas one may reasonably rely on the good faith and fair dealing of a partner or joint venturer in carrying out the common goals of the joint venture, the dissolution of that joint venture places the principals in a different light. In such a setting each may reasonably expect the other to seek a position which is in that person's best interest, and the elements of trust and reliance necessary to a fiduciary obligation would not be present. See Sind v. Pollin, 356 A.2d 653, 655 (D.C.App. 1976); 48A C.J.S. Joint Ventures § 24.
On the other hand, to the extent that defendants may be found to have assumed the obligation to manage the disposition of the joint venture assets, then their actions may ultimately be judged by fiduciary standards. That would not include the negotiation of the dissolution agreement; it could include the sale of the remaining units. It is with respect to this latter *224 activity that plaintiffs' claims regarding the sale of the condominium units below market value may be relevant. Plaintiffs, however, press this issue for a different reason. They claim that the notices of lis pendens are essential to fulfill their equitable claim of rescission and that they have no adequate remedy at law because there is no reasonable means of measuring their loss. The proofs do not support that conclusion. The fact that a number of units may be sold below value may indeed effect the market, particularly when the market is limited. However, that does not mean that evidence will not be available as to what the sales prices should have been and what the true losses were.
Based on the above, it appears that plaintiffs likelihood of success on the merits is less than probable. On the other hand, given the range of probabilities, it cannot be said that there is no "probability" that judgment will be entered in their behalf. It is thus necessary to evaluate that probability against the detrimental impact of the continued filing of the notices of lis pendens on defendants. In that regard it is significant that defendants have entered into a large number of contracts for the sale of condominium units with third parties and are actively marketing the rest. All of the sales are jeopardized by these notices as is the likelihood of future sales. Not only would the financial impact resulting from the delay or loss of these sales have a major impact on defendants, given the significant carrying charges, but it would seriously impact many innocent third parties.[6] This factor also militates against the likelihood of plaintiffs succeeding in achieving the remedy of rescission, even assuming a liability finding favorable to plaintiffs. It is clear, therefore, that the negative impact created by the continued presence of the notices of lis pendens is substantial.
*225 Weighing this impact against the relative weakness in plaintiffs' varying claims and considering the unlikelihood of rescission, it appears that the balance to be struck here favors discharge. Although, as already indicated, these factual findings are necessarily tentative, given all of the circumstances presented, plaintiffs have failed to meet their burden in establishing a probability that final judgment will be entered in their behalf sufficient to justify the continuation of the filing of the various notices of lis pendens. R. 4:63A. Defendants' motion to discharge will be granted.
NOTES
[1] The within opinion represents a formalization of an oral opinion rendered on September 9, 1983.
[2] For a more complete recital of the legislative history see "Lis Pendens: A Legislative Response to a Judicial Invitation," 7 Seton Hall Legis.J. 59 (1983).
[3] By separate statutes, a notice of lis pendens may also be discharged if plaintiff fails to prosecute the action diligently, N.J.S.A. 2A:15-10, or allows three years to lapse from the date of filing, N.J.S.A. 2A:15-11 or if the court permits the posting of a bond in lieu thereof, N.J.S.A. 2A:15-15.
[4] See original Senate Bill 918 (1982).
[5] Although the standard involved has been likened in certain of the legislative history to that which applies upon the granting of a writ of attachment, the language of R. 4:60-5(a) dealing with writs speaks only in terms of "a probability" of success and does not contain qualifying language similar to that referred to in N.J.S.A. 2A:15-7(b). Cf. United S. & L. Ass'n. v. Scruggs, supra 181 N.J. Super. at 60.
[6] See Ray v. Beneficial Finance Co. of North Jersey, 92 N.J. Super. 519, 539 (Ch.Div. 1966) holding that the remedy of rescission contemplates the ability to return the parties to the status quo ante.