ONG INTERNATIONAL (U.S.A.) INC., a Nevada corporation; D & D Management, a Utah corporation; and David L. Alldredge, an individual, Plaintiffs and Appellees,

v.

11TH AVENUE CORPORATION, a Utah corporation, fka Salt Lake Memorial Mausoleum, and Keith E. Garner, an individual, Defendants and Appellants.

Nos. 910522, 920066.

Supreme Court of Utah.

April 6, 1993.

Robert S. Campbell, Clark W. Sessions, Dean C. Andreasen, Joann Shields, Salt Lake City, for plaintiffs and appellees.

John K. Mangum, Arthur H. Nielsen, Clark R. Nielsen, Gary A. Weston, Salt Lake City, for defendants and appellants.

HALL, Chief Justice:

Defendants 11th Avenue Corporation and Keith Garner appeal from a jury verdict awarding plaintiffs Ong International Inc., D & D Management, and David Alldredge damages for fraudulent misrepre-

sentation. The judgment includes rescission of two contracts for the sale of a partnership, repayment to Ong International Inc. of the original $1,240,220 invested in the partnership, consequential damages of $1,165,220, and punitive damages of $1,800,000. We affirm the verdict.

## I. FACTS

"Where evidence is in conflict in a jury trial, we assume that the jury believed those facts that support its verdict, and we view the facts and the reasonable inferences that arise from those facts in a light most supportive of the jury's verdict." [1] We therefore recite the following facts in a light most favorable to the jury's verdict.

Defendant Keith Garner, a Utah developer, is the principal shareholder of defendant 11th Avenue Corporation. In 1979, 11th Avenue purchased the Salt Lake Memorial Mausoleum located above the Salt Lake City Cemetery. The Mausoleum provides facilities for above-ground interment. It consists of a main building of indoor interment compartments called "crypts," which are constructed of concrete, with pipes providing ventilation to the outside.

From 1984 through 1987, defendants constructed five outdoor pavilion structures, known as "pods," for further interment facilities. Each pod contains 102 crypts, for a total of 510. Of the 510 new crypts, the first 51 were made of concrete; the next 153 were constructed of a mixture of poured concrete and wood; and the remaining 306 were constructed of wood only, including plywood and chipboard. The individual crypts were then covered with a marble facing that had to be removed to see the construction components.

Garner first met plaintiff David Alldredge in 1965 in Hong Kong, where Alldredge was serving a mission for the Church of Jesus Christ of Latter–Day Saints ("L.D.S. Church"). Garner was then president of the Hong Kong Mission, and Alldredge acted as his assistant. At that time, Alldredge also became acquainted

---

1. *Bennion v. LeGrand Johnson Constr. Co.,* 701 P.2d 1078, 1082 (Utah 1985) (citations omitted); *see also State v. Brown,* 201 Utah Adv.Rep. 4, 9, —— P.2d ——, —— (November 30, Utah 1992); *Cintron v. Milkovich,* 611 P.2d 730, 732 (Utah 1980).

with Elder Marion D. Hanks, an L.D.S. Church general authority, who presided over the region encompassing Hong Kong. Alldredge developed a great respect for Hanks and Garner and for their positions of leadership within the L.D.S. Church. Alldredge later became a general manager of the International Bank of Asia in Hong Kong. His duties included matching potential investors with business opportunities. While in that position, he met Ong Ka Thai ("Ong"), chairman of the board of plaintiff Ong International Inc., who became Alldredge's client.

Garner and Alldredge met again in Provo in 1986. That encounter led to discussions concerning possible joint ventures between Garner and Ong. In April of 1987, Ong and Alldredge travelled to the United States to discuss an unrelated business venture with Garner. While in Salt Lake City, Garner gave them a tour of the Mausoleum, including a "model crypt" made of concrete. Garner told Alldredge that the model was representative of all the crypts on the property, including those located in the outdoor pavilions.

In November of 1987, Garner called Alldredge in Hong Kong and invited Ong to invest in the Mausoleum project. Garner told Alldredge that Elder Hanks owned 25 percent of the project and would sell that interest to Ong. Garner followed the phone call with a letter reiterating the business offer and again mentioning Hanks' ownership of stock in the Mausoleum. In December of 1987, Alldredge received a more comprehensive tour of the Mausoleum grounds. He was again shown the concrete model crypt and told that all the crypts on the property were made of solid concrete and were waterproof, fireproof, and earthquake proof. Alldredge was shown the outdoor pavilions but did not walk inside the individual pods.[2]

In April of 1988, Ong and his wife flew to Salt Lake City and were given a tour of the Mausoleum. They were shown the model concrete crypt and the crypts where

Hanks and his wife were supposedly going to be interred. Garner told Ong and his wife that the model was representative of all the crypts on the property. Garner never mentioned to Ong that a majority of the outdoor crypts were made of wood. Based on Garner's representations and a separate investigation of the financial viability of the Mausoleum, Ong International Inc., D & D Management (Alldredge's management corporation), and 11th Avenue Corporation entered into a partnership agreement on May 13, 1988. Ong International Inc. initially invested $800,000 in return for a 50 percent ownership in the partnership. Alldredge, through D & D Management, was assigned management duties for the partnership. He moved from Hong Kong to Salt Lake City in the summer of 1988 to assume those duties.

During the next year, Garner and Alldredge developed difficulties in their business relationship. Alldredge testified that Garner would not let Alldredge assume key managerial functions that he was entitled to perform pursuant to the partnership agreement. Those difficulties finally became insurmountable, and the parties decided to terminate the Mausoleum partnership. The parties entered a partnership redemption agreement on February 28, 1989, whereby Ong International Inc. purchased Garner's interest in the Mausoleum for $440,000. The redemption agreement included a clause (the "Release"), drafted by Ong's attorney, that released the parties from all claims and causes of action based on their association with the partnership.

Alldredge continued to manage the Mausoleum after the redemption agreement was signed, acting as Ong's agent rather than as a partner. In May of 1990, over a year later, Alldredge decided to inspect the crypts. After removing the marble facing on several of them, he discovered that a large number of the crypts were made of plywood and wood two-by-fours and four-by-fours. Some of the crypts were ventilated by means of a drainage hole drilled

---

**2.** Until October of 1987, 84 of the outdoor crypts were not covered with marble facing, and 48 of those crypts were made of wood. However, after October of 1987, all the crypts were covered with marble facing that had to be removed to see inside.

through the bottom piece of plywood, which would allow any escaping liquids to drain down and gasses to go up, into other crypts. Many of the crypts had no ventilation of any kind. Upon discovering that the crypts were not all concrete, Alldredge immediately contacted the Mausoleum's insurance companies and attorney to inform them of the fact. Since May of 1990, none of the wooden or mixed wood and concrete crypts have been sold.

Plaintiffs initiated this suit in June of 1990, after making a demand on defendants to rescind the partnership and redemption agreements. At trial, Ong testified that Ong International Inc. would not have invested in the Mausoleum if it had known of the wooden crypts. Both Ong and Alldredge testified that they would not have signed the redemption agreement containing the release if they had known that the representations about the outdoor crypts were false. Plaintiffs' experts testified that they had never heard of wood crypts being used anywhere else in the United States, that the crypts did not measure up to industry standards, and that the wood crypts must be replaced in order to make the crypts saleable.

Plaintiffs presented testimony that the building permit issued by Salt Lake City for construction of the crypts was revoked in January of 1987 and that a certificate of occupancy was never issued for the new crypts. Further, the crypt plans submitted to Salt Lake City by Garner's architect indicated that the crypts would be built of concrete, not wood.

Plaintiffs also called Hanks, who stated that he has never held an ownership interest of any sort in the Mausoleum.[3] Hanks also testified that in October of 1988, he and his wife received an unsolicited gift certificate for two crypts in the Mausoleum from Garner. He and his wife already owned a plot in the cemetery and retained the certificate only out of courtesy to Gar-

ner. Hanks never authorized use of his name by Garner for any purpose.

On appeal from a jury verdict in plaintiffs' favor, defendants allege that the trial court erred by (1) ruling, as a matter of law, that the Release contained in the redemption agreement is unenforceable; (2) refusing to grant defendants' motion in limine to exclude mention of Garner's wealth at trial before a prima facie finding of liability for punitive damages was made; and (3) making numerous erroneous evidentiary rulings and prejudicial comments, thereby depriving defendants of a fair trial. Defendants also allege that the jury verdict and damage award were the result of passion and prejudice and that the trial court's award of costs to plaintiffs was an abuse of discretion. We address each issue in turn.

## II. RELEASE OF LIABILITY

The redemption agreement executed by the parties on February 28, 1989, included the following:

13.2 *Release by The Partnership.* Except as otherwise provided in this agreement, the Partnership, its partners, their respective agents, officers, employees, successors, assigns and heirs, and each of them, forever discharge SLMM, its agents, officers and employees from any and all claims, demands, rights of action or causes of action, whether known or unknown, howsoever arising, which in any way are based upon or related to SLMM's association with the Partnership.

Defendants claim that this language unambiguously bars plaintiffs from bringing suit for fraud arising out of the sale of the Mausoleum to Ong International Inc. Specifically, defendants claim that the trial court applied the wrong legal standard: Instead of allowing the jury to determine whether the redemption agreement was procured by fraud, thereby vitiating the

---

**3.** Hanks did testify that he made loans totalling $75,000 to Douglas "Coy" Miles, who was a shareholder of the Mausoleum (formerly a corporation) before the partnership was formed. In 1986, Miles gave Hanks a stock certificate representing Miles' investment in the Mausoleum as collateral for the loan. Hanks did not request the collateral, was never actually a shareholder of the Mausoleum, and never participated in its business affairs in any fashion.

Release contained therein, the test should have been whether the Release itself, separate from the redemption agreement, was procured by fraud. Defendants further argue that because plaintiffs presented no evidence showing that defendants fraudulently induced plaintiffs to actually release all known and unknown claims, they are barred from bringing suit.

Before addressing this issue, we note that defendants do not object on appeal to the jury instruction concerning the Release. Instead, they obliquely attack the trial court's refusal to enforce the Release. Technically, defendants have failed to properly raise this issue. However, defendants did object to the Release instruction before it was submitted to the jury, thereby alerting the trial court to their concerns and preserving the issue for appeal. They also offered an instruction of their own that was rejected by the court. We will therefore address defendants' arguments, with the admonition to future litigants that issues on appeal must be precisely and correctly framed.

We first state the applicable standard of review. A trial court's legal determinations are given no deference but are reviewed for correctness.[4] An appeal challenging the refusal to give a jury instruction likewise presents a question of law for which we grant no particular deference.[5]

Defendants challenge instruction No. 40, which concerns the Release.[6] Instruction 40 is derived from *Lamb v. Bangart*,[7] in which this court refused to enforce a contract clause limiting the plaintiffs' remedy in a fraud action.

In *Lamb*, a jury determined that the defendants misrepresented the breeder status, virility, and health of a prize bull that was sold to the plaintiffs.[8] As a defense, the defendants attempted to invoke a clause in the contract for the sale of the bull that limited the amount of money the plaintiffs could recover if the bull died. This court affirmed the trial court's determination that the clause limiting recovery did not apply in a fraud action. We stated: "The law does not permit a covenant of immunity which will protect a person against his own fraud on the ground of public policy. A contract limitation on damages *or remedies* is valid only in the absence of allegations or proof of fraud."[9]

Defendants claim that *Lamb* is inapplicable and that the language quoted above is disregardable dicta. The proper analysis, defendants argue, is contained in *Ingram Corp. v. J. Ray McDermott & Co.*[10] In that case, plaintiff Ingram entered into a settlement agreement and release with defendant McDermott to settle all outstanding claims the parties had against each other as a result of Ingram's sale of its assets to McDermott. Six years later, Ingram brought an antitrust suit against McDermott, alleging that McDermott had successfully conspired to drive Ingram out of business several years earlier. When McDermott invoked the releases executed by the parties, Ingram claimed that the defendant's fraudulent concealment of its antitrust activities vitiated the releases.[11]

The Fifth Circuit determined, based on federal antitrust law, that Ingram's claims

---

4. *Eskelsen v. Town of Perry*, 819 P.2d 770, 771 (Utah 1991).

5. *State v. Hamilton*, 827 P.2d 232, 238 (Utah 1992); *Ramon v. Farr*, 770 P.2d 131, 133 (Utah 1989).

6. Instruction 40 states:

    A release of liability is a type of contract and may generally be rescinded for fraud as with other contracts. For public policy reasons, the law does not permit a contract to contain a covenant of immunity that would protect a party against his own fraud. A release in a contract is invalid where the contract itself containing the release was fraudulently induced.

7. 525 P.2d 602 (Utah 1974).

8. *Id.* at 604.

9. *Id.* at 608 (emphasis added) (citing *Clements Auto Co. v. Service Bureau Corp.*, 9 U.C.C.Rep. Serv. (Callaghan) 189, 202 (1971); *Klein v. Asgrow Seed Co.*, 246 Cal.App.2d 87, 54 Cal.Rptr. 609, 618–19 (Ct.App.1966)).

10. 698 F.2d 1295 (5th Cir.1983).

11. *Id.* at 1302.

were barred by the releases.[12] That decision was based on the court's determination that Ingram did not show that "during the [release] negotiations McDermott misrepresented material facts or concealed facts which would materially qualify those already stated."[13] The connection between the alleged misrepresentations and the release negotiations, the court continued, was "too far attenuated to be of probative value"[14] and the releases were not, therefore, an "integral part of the scheme to violate antitrust laws."[15] The court noted: "Fraudulent inducement sufficient to nullify a contract ... can vitiate a release. This is hornbook law."[16]

■ Hence, although the court in *Ingram* did differentiate between the releases and the settlement agreement, it also based its ruling on the facts that the plaintiffs made an inadequate showing of fraud and that the alleged misrepresentations were so far removed from the release negotiations as to be inconsequential. We believe that the *Ingram* decision is in accord with our policy set forth in *Lamb* of vitiating agreements, including releases, premised on fraud.[17] Accordingly, a release will be voidable if it was an integral part of a scheme to defraud.

In the instant case, plaintiffs alleged, and the jury found, that defendants committed fraud against plaintiffs in the sale of the Mausoleum under both the purchase and the redemption agreements. That fraud included the false representation that the pavilion crypts were built of the same material, i.e., concrete, as the indoor mausoleum crypts. Moreover, during the course of the partnership, defendants failed to reveal the true nature of the crypt construction. Procurement of the Release was an integral and continuing part of defendants' willful misrepresentations and omissions concerning the construction of the crypts plaintiffs purchased. It cannot be separated from the fraudulently induced contract in which it is contained. Therefore, the jury instruction concerning the Release was not an improper statement of law, and we will not disturb the trial court's submission of it to the jury.[18]

■ Defendants also challenge the trial court's determination that a fiduciary relationship existed at the time the redemption agreement was signed.[19] By that time, defendants claim, the parties were adversaries, dealing at arm's length. Defendants contend that they made no affirmative misrepresentations about the nature of the crypts during the course of the partnership and had no fiduciary duty to actively reveal the wood construction. It was error, therefore, to submit the fiduciary duty instructions to the jury, thereby allowing the jury to find a breach based on an omission as well as an affirmative misrepresentation.

■ Normally, partners "occupy a fiduciary relationship and must deal with

---

12. *Id.* at 1323.

13. *Id.* at 1314.

14. *Id.* at 1315.

15. *Id.* at 1323.

16. *Id.* at 1314 (citing Restatement (Second) of Contracts §§ 164, 167 (1979); 12 Samuel Williston, *A Treatise on the Law of Contracts* § 1488 (3d ed. 1970); 37 Am.Jur.2d *Fraud and Deceit* §§ 8, 12 (1968); 37 C.J.S. *Fraud* § 64 (1943)).

17. *See also Norton v. Blackham,* 669 P.2d 857, 858 (Utah 1983) (factual issues as to whether a defendant obtained a release by misrepresentation will preclude summary judgement); *Horgan v. Industrial Design Corp.,* 657 P.2d 751, 753 (Utah 1982) ("A release is a type of contract and may generally be enforced or rescinded on the same grounds as other contracts.").

18. We do not, however, hold that a release is *never* valid against fraud claims. There may be situations where a person would voluntarily choose to waive existing fraud claims or even waive unknown claims of fraud. However, this case does not present such a situation.

19. Again, defendants imprecisely attack the correctness of the trial court's legal conclusion in a general fashion, without specifically appealing the sufficiency of the fiduciary duty instructions given to the jury. We exercise our discretion to reach this issue here only because defendants did raise a proper objection to submission of the fiduciary duty instructions below.

each other in the utmost good faith."[20] When a fiduciary relationship exists, a partner's silence as to a material matter can constitute fraud.[21] It is true, however, that when a relationship involving partners becomes adversarial and the partners deal at arm's length, their fiduciary duties to one another may be extinguished.[22] However, for two reasons, we do not believe that defendants' duty to reveal the true nature of the crypts expired.

First, the record reveals that Garner controlled and withheld relevant partnership information from plaintiffs during the course of the partnership. Plaintiffs presented testimony that the reason the partnership was terminated in the first place was that Garner refused to allow Alldredge to assume key managerial duties called for under the partnership agreement. Alldredge testified that he did not have access to important computer and documentary records until after the partnership was terminated. A fiduciary duty can exist where one party has decidedly greater access to information than the other,[23] and that was the case here.

Second, a seller has a duty to represent fairly and accurately the material elements of property sold when such elements are not easily ascertainable by the buyer and materially affect the value of the property.[24] Here, the heavy and cumbersome marble facings were covering the crypts before the partnership agreement was signed, making it difficult to view the construction. We cannot say that it was unreasonable for plaintiffs to rely on Garner's previous explicit and implicit statements that the crypts were concrete rather than making an independent inspection. Moreover, plaintiffs presented expert testimony that the wood crypts could not be sold and that it would cost approximately $522,698 to replace the wood with concrete. Because the wood construction was not easily ascertainable and affected the value of the mausoleum property, defendants cannot claim that they had no duty to provide complete information to plaintiffs.[25]

The existence of a fiduciary relationship and its concomitant duty to disclose is for the trial court to decide.[26] The trial court's determination that such a duty existed in

**20.** *Burke v. Farrell,* 656 P.2d 1015, 1017 (Utah 1982); *see* Utah Code Ann. § 48-1-18.

**21.** *First Sec. Bank of Utah, N.A. v. Banberry Dev. Corp.,* 786 P.2d 1326, 1328 (Utah 1989) (citing *Elder v. Clawson,* 14 Utah 2d 379, 384 P.2d 802, 804–05 (1963)).

**22.** *See Sugarhouse Fin. Co. v. Anderson,* 610 P.2d 1369, 1373 (Utah 1980) (no duty to disclose when parties deal at arm's length); *see also Walter v. Holiday Inns, Inc.,* 784 F.Supp. 1159, 1167–68 (D.N.J.1992) (whatever duty existed before was gone after the parties' relationship became estranged and adversarial); *Fravega v. Security Sav. & Loan Ass'n,* 192 N.J.Super. 213, 469 A.2d 531, 536 (1983) (standard of utmost good faith between joint venturers should not extend where relationship between parties is adversarial).

**23.** *See Burke,* 656 P.2d at 1017; *Sugarhouse Fin. Co.,* 610 P.2d at 1373.

**24.** *See Elder v. Clawson,* 14 Utah 2d 379, 384 P.2d 802, 805 (1963); *accord Hill v. Jones,* 151 Ariz. 81, 84, 725 P.2d 1115, 1118 (Ct.App.1986) (seller had duty to reveal damage that materially affected value of property); *Moschelle v. Hulse,* 190 Mont. 532, 622 P.2d 155, 159 (1980) (creating false impression as to matter of vital importance to purchaser amounted to fraud);

*McRae v. Bolstad,* 32 Wash.App. 173, 646 P.2d 771, 774 (1982) (seller had duty to disclose all material facts not reasonably ascertainable to buyer).

**25.** Defendants also argue that the wood construction was immaterial to plaintiffs' investment in the Mausoleum or to the release of all claims. The materiality of the crypt's construction was a question of fact for the jury, which decided the issue affirmatively. To challenge the sufficiency of the evidence supporting the jury's determination, plaintiffs must marshal the evidence supporting the verdict and then demonstrate that even viewing the evidence in the light most favorable to that verdict, the evidence is insufficient to support it. *Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 799 (Utah 1991); *Cambelt Int'l Corp. v. Dalton,* 745 P.2d 1239, 1242 (Utah 1987); *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985); *Von Hake v. Thomas,* 705 P.2d 766, 769 (Utah 1985). Because they have failed to do so, we decline to address the issue. *Scharf,* 700 P.2d at 1070.

**26.** *First Sec. Bank,* 786 P.2d at 1328–29. Whether the fiduciary duty was breached is resolved by the trier of fact. *Id.* at 1329 (citing *R.A. Peck, Inc. v. Liberty Fed. Sav. Bank,* 108 N.M. 84, 766 P.2d 928, 932 (Ct.App.1988)).

this case is supported by the record, and therefore, the court did not err by submitting the fiduciary duty instructions to the jury.

### III. EVIDENCE OF GARNER'S WEALTH

Defendants next contest the trial court's refusal to exclude evidence of Garner's wealth until a prima facie finding of liability for punitive damages could be made by the court. The trial court rejected defendants' objections and allowed plaintiffs to refer to Garner's substantial wealth in the opening statement and again during Garner's examination.

■ Defendants first claim that the trial court should not have instructed the jury to consider wealth as a factor in assessing punitive damages. Defendants raise this claim for the first time on appeal. "With limited exceptions, the practice of this court has been to decline consideration of issues raised for the first time on appeal." [27] Because no valid exceptions exist, we do not address this issue.

■ Next, defendants allege that the trial court erred by not requiring a finding of liability for punitive damages before admitting evidence of Garner's wealth as mandated by Utah Code Ann. § 78–18–1(2).[28] The appropriate standard of review for a trial court's interpretation of statutory law is correction of error.[29]

The trial court found that subsection 78–18–1(2) was not applicable because it specif-

ically applies only to claims for punitive damages arising on or after May 1, 1989.[30] Plaintiffs' claims arose prior to the statute's effective date, the court reasoned, thereby precluding its application.

■ Defendants now argue that plaintiffs' claims arose *after* the statute's effective date, when the wood construction was actually discovered in May of 1990. However, defendants failed to present this argument to the court below and, indeed, conceded in their motion in limine that plaintiffs' claims arose before the statute went into effect. Therefore, they may not raise this issue on appeal.[31] Defendants also argue that subsection 78–18–1(2) is procedural and therefore should have been applied retroactively at trial. They rely on *Docutel Olivetti v. Dick Brady Systems, Inc.*,[32] in which we stated, " 'Procedural statutes enacted subsequent to the initiation of a suit ... apply not only to future actions, but also to accrued and pending actions as well.' " [33] This exception to the general rule that statutes are applied prospectively only [34] is valid. However, the specific legislative mandate that subsection 78–18–1(2) applies only to claims for punitive damages arising on or after May 1, 1989, precludes application of the exception here. Therefore, that subsection provides no assistance to defendants.

Our discussion of wealth does not stop there, however. Although both the parties and the trial court focused on subsection 78–18–1(2)'s application as being the deter-

---

**27.** *Espinal v. Salt Lake City Bd. of Educ.*, 797 P.2d 412, 413 (Utah 1990) (citing *Pratt v. City Council*, 639 P.2d 172, 173–74 (Utah 1981)).

**28.** Utah Code Ann. § 78–18–1(2) states, "Evidence of a party's wealth or financial condition shall be admissible only after a finding of liability for punitive damages has been made."

**29.** *State v. James*, 819 P.2d 781, 796 (Utah 1991); *State v. Rio Vista Oil, Ltd.*, 786 P.2d 1343, 1347 (Utah 1990).

**30.** *See* 1989 Utah Laws ch. 237, § 4; *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 807 n. 23 (Utah 1991).

**31.** *See Espinal*, 797 P.2d at 413 (citing *Pratt*, 639 P.2d at 173–74). Defendants contend that we

should reach this and other new points raised for the first time on appeal because they are really new arguments as opposed to new issues. We decline to honor such a distinction. Our concern is whether an argument was addressed in the first instance to the trial court. *See State v. Carter*, 707 P.2d 656, 660–61 (Utah 1985) (citing *State v. Lee*, 633 P.2d 48, 53 (Utah), *cert. denied*, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981)). "Failure to raise the point [below] precludes its consideration here." *Id.* at 661.

**32.** 731 P.2d 475 (Utah 1986).

**33.** *Id.* at 478 (quoting *State Dep't of Social Servs. v. Higgs*, 656 P.2d 998, 1000 (Utah 1982)).

**34.** *See* Utah Code Ann. § 68–3–3; *Madsen v. Borthick*, 769 P.2d 245, 253 (Utah 1988).

minative issue, defendants also generally argue that the wealth evidence was prejudicial, raising concerns under Utah Rule of Evidence 403.

Plaintiffs' attorney revealed Garner's substantial wealth to the jury, with the court's acquiescence, in his opening statement. Over defendants' vehement objections, plaintiffs were also allowed to present Garner's financial statement (listing his assets at over seven million dollars) and tax returns to the jury. Defendants argue that regardless of the statute's application, admission of evidence of Garner's wealth deprived them of a fair trial on the issue of liability.

Prior to the enactment of subsection 78–18–1(2), a general concern for use of wealth evidence existed at common law.[35] We recognize the potentially prejudicial effect information of a defendant's wealth can have in a jury trial. As one scholar noted, "[R]ich men do not fare well before juries, and the more emphasis placed on their riches, the less well they fare."[36] In *Wilson v. Oldroyd*, this court first contemplated a bifurcated procedure for determining liability and assessing punitive damages:

As to admitting testimony concerning defendant's financial condition: It is for the trial court to determine in the first instance whether the facts are such that malice can be found, and if so, it is well settled that it is proper to receive evidence and consider the wealth of the defendant as bearing upon the issue of punitive damages.[37]

■ Hence, before section 78–18–1 was enacted in 1989, evidence of a defendant's wealth could be admitted after the trial court determined that the plaintiff had made a prima facie showing of liability for punitive damages. This court has not elaborated on the necessity of a prima facie showing since *Wilson* was decided in 1954,

and subsection 78–18–1(2) now supersedes that decision. However, we must decide for the purposes of this case whether an adequate prima facie showing was made. We think that it was.

Our review of the record reveals that the trial court actually did determine that a sufficient showing of malice was made and that wealth evidence could be admitted. However, the court did not make that determination until the close of plaintiffs' case-in-chief, after Garner's substantial wealth was already revealed to the jury. Although the record is devoid of an actual prima facie finding prior to that time, the trial court did have sufficient information before it on which such a showing could be made. That information included the parties' extensive summary judgment motions relating to the release, detailed trial briefs, and two motions in limine. By the time the trial began, the court was well versed on both sides' evidence and was adequately prepared to make a prima facie finding concerning the existence of malice before any wealth evidence was admitted. We find that the trial court substantially complied with the common law procedure in place prior to enactment of subsection 78–18–1(2) and did not err by admitting evidence of Garner's wealth.[38]

## IV. SUFFICIENCY OF THE COMPENSATORY AND PUNITIVE DAMAGE AWARDS

Defendants raise several points of error concerning the award of both compensatory and punitive damages. We begin by addressing the compensatory damage award. Defendants claim that the jury's findings of conversion and breach of fiduciary duty are unsupported by the evidence and that the $512,098 conversion award is equally unsupported. We note that defen-

---

**35.** *See Wilson v. Oldroyd,* 1 Utah 2d 362, 267 P.2d 759, 766 (1954); Kia Hodgson, *Recent Development,* 1990 Utah L.Rev. 269, 271.

**36.** Clarence Morris, *Punitive Damages in Tort Cases,* 44 Harv.L.Rev. 1173, 1191 (1931).

**37.** *Wilson,* 267 P.2d at 766 (citations omitted).

**38.** By determining that the trial judge adequately followed the common law procedure set forth in *Wilson,* we do not comment on the proper procedure under subsection 78–18–1(2), except to note that the statutory procedure undoubtedly places greater restrictions on the use of wealth evidence at trial.

dants did not marshal the evidence supporting the jury's verdict on those two counts and instead argued selected evidence favorable to their position. Because of this failure, we reject defendants' attack on the conversion and breach of fiduciary duty findings.[39] Moreover, because both claims were dismissed by the trial court after the fraud verdict was returned, no damages were actually awarded for either claim, and the issue is therefore moot.

■ Next, defendants attack the trial court's determination that plaintiffs are entitled to a reasonable rate of return on money invested to operate the Mausoleum from the time the redemption agreement was signed until the time of trial.[40] Defendants claim that plaintiffs' rate of return evidence was speculative and that no legal basis exists to allow such a recovery in a rescission action.

■ At trial, plaintiffs elected the remedy of rescission. The goal of rescission is to restore the status quo that existed prior to the parties' agreement.[41] The status quo rule

"is not a technical rule, but rather it is equitable, and requires practicality in adjusting the rights of the parties. How this is to be accomplished, or indeed whether it can, *is a matter which is within the discretion of the trial court* under the facts as found to exist by the trier of fact."[42]

The trial court therefore has discretion to fashion an adequate and reasonable remedy so that an aggrieved party is adequately compensated for its loss, so long as that remedy is not duplicative.[43]

■ Generally, a court will allow recovery for lost profit or other related consequential damages in a fraud action,[44] provided that such damages can be proven with reasonable certainty and are a reasonably foreseeable consequence of the defendant's act.[45] This court has also affirmed a judgment allowing rescission as well as recovery for monetary and punitive damages in a fraud action.[46] Hence, allowing recovery for monetary damages as well as ordering rescission of the agreements were permissible.

Moreover, plaintiffs presented uncontroverted expert testimony concerning the rate of return they would have received if the money had been invested elsewhere. The damages were presented with reasonable certainty, were not duplicative, and were reasonably foreseeable in light of defendants' acts. The trial court undoubtedly determined that allowing recovery for a reasonable rate of return on the money used to operate the Mausoleum was necessary to restore the parties to the status quo. We find no abuse of discretion in making such a determination in this case.

■ After the verdict was rendered by the jury, defendants filed a motion for new

---

**39.** *See Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 800 (Utah 1991); *Cambelt Int'l Corp. v. Dalton,* 745 P.2d 1239, 1242 (Utah 1987); *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985).

**40.** The jury awarded plaintiffs $87,860 for the reasonable rate of return they would have received if they had invested their money elsewhere. This amount was based on expert testimony presented by plaintiffs.

**41.** *Dugan v. Jones,* 724 P.2d 955, 957 (Utah 1986); *Mawhinney v. Jensen,* 120 Utah 142, 232 P.2d 769, 773 (1951).

**42.** *Dugan,* 724 P.2d at 957 (emphasis added) (quoting *Smith v. Huber,* 666 P.2d 1122, 1124–25 (Colo.App.1983)).

**43.** Dan B. Dobbs, *Handbook on the Law of Remedies* § 9.2, at 598, § 9.4, at 634 (1973) [hereinafter Dobbs].

**44.** *See Synergetics v. Marathon Ranching Co.,* 701 P.2d 1106, 1112–13 (Utah 1985) (affirming trial court's award for rental value of property in fraud action). *See generally* Restatement (Second) of Torts § 549 (1976) and comments thereto. Other available consequential damages include expenses resulting from fraud, loss of good will, any expenditures in mitigation of damages, lost earnings, prejudgment interest, and loss of interest on loans required to finance the business. Dobbs at 598–99.

**45.** *See Canyon Country Store v. Bracey,* 781 P.2d 414, 418 (Utah 1989) (citing *Cook Assocs., Inc. v. Warnick,* 664 P.2d 1161, 1165–67 (Utah 1983)); Dobbs at 598–99.

**46.** *Synergetics,* 701 P.2d at 1112–13.

trial or remittitur under Utah Rule of Civil Procedure 59. That motion was denied. Defendants claim two points of error in the trial court's refusal to grant a new trial or reduce the punitive damage award: (1) Malice was not sufficiently shown, and (2) the award exceeds the proper punitive-to-compensatory-damages ratio. We address each point in turn.

"The general rule governing the grant of a new trial is that the trial court must find at least one of the seven grounds listed in rule 59 to be met." [47] Moreover, "it is well settled that, as a general matter, the trial court has broad discretion to grant or deny a motion for a new trial" or for remittitur.[48] "In reviewing the trial court's ultimate decision to grant or deny a new trial, we will reverse only if there is no reasonable basis for the decision." [49]

Defendants' assertion that there is insufficient evidence of malice [50] to support the punitive damage award is contradicted by the record. First, the jury found intentional fraud. Second, the trial court, in passing on defendants' motion for a new trial, concluded that there was substantial evidence to support the jury's determination that defendants acted with reckless disregard of plaintiffs' rights. Based on the record, we conclude that the trial court reasonably determined that defendants acted with the requisite mental state for an award of punitive damages.

Our decision in *Crookston* also provides guidelines for determining whether the punitive damage award is excessive under Utah Rule of Civil Procedure 59(a)(5).[51] There, we set forth seven factors the fact finder must consider in assessing the amount of punitives to award.[52] We also discussed the general rule governing the acceptable ratio for punitive to actual damages. Where the punitive damages are below $100,000, we have upheld ratios of 3 to 1 punitive to actual damages.[53] However, punitive damage awards that exceed $100,000 are more heavily scrutinized than smaller awards, and the acceptable ratio tends to be lower in these cases.[54] If the award exceeds the ratios set by our past pattern of decision, the trial court does not necessarily have to reduce the award. If such an award is upheld, however,

> the trial judge must make a detailed and reasoned articulation of the grounds for concluding that the award is not excessive in light of the law and the facts. The judge's articulation should generally be couched in terms of one or more of the seven factors we earlier listed as proper considerations in determining the amount of punitive damages, unless some other factor seems compelling to the trial court.[55]

Defendants claim that the punitive award exceeds the proper ratio because the only amount that should enter into the equation is the $447,034 the jury returned

---

**47.** *Crookston,* 817 P.2d at 803. The seven grounds for a new trial under rule 59 are:
(1) Irregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion by which either party was prevented from having a fair trial.
(2) Misconduct of the jury....
(3) Accident or surprise, which ordinary prudence could not have guarded against.
(4) Newly discovered evidence....
(5) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice.
(6) Insufficiency of the evidence to justify the verdict or other decision, or that it is against law.
(7) Error in law.
Utah R.Civ.P. 59(a)(1)–(7).

**48.** *Crookston,* 817 P.2d at 804 (citations omitted).

**49.** *Id.* at 805.

**50.** *See* Utah R.Civ.P. 59(a)(6).

**51.** *Crookston,* 817 P.2d at 807–11.

**52.** Those seven factors are (1) the relative wealth of the defendant, (2) the nature of the alleged misconduct, (3) the facts and circumstances surrounding such conduct, (4) the effect thereof on the lives of the plaintiff and others, (5) the probability of future recurrence of the misconduct, (6) the relationship of the parties, and (7) the amount of actual damages awarded. *Id.* at 808.

**53.** *Id.* at 810.

**54.** *Id.*

**55.** *Id.* at 811.

against Garner individually for fraud, not the entire $2,405,022 assessed jointly and severally against Garner and his corporation. When $447,034 is compared with the punitive award of $1,800,000, the ratio of punitive to actual damages exceeds 4 to 1. The jury did return fraud damages against Garner individually. However, the trial court declared in its judgment and decree that the fraud award against Garner individually "is enforceable only to the extent that it ensures recovery by Ong International" of the rescission and consequential damages as determined by the jury. Thus, the correct damage award to consider in the equation is the total damage award of $2,405,022, not the $447,034 recoverable only if the award against Garner and his corporation cannot be collected.

■ As the trial court found, the correct ratio of punitive to actual damages in this case is approximately 1 to 1½. That ratio is well within the acceptable range set forth in *Crookston*.[56] Moreover, the trial court also made a detailed finding based on the seven factors enunciated in *Crookston*. That finding, as well as the permissible ratio of punitive to actual damages, lends ample support for the award, and we therefore affirm it.

## V. COMMENTS AND EVIDENTIARY RULINGS BY THE TRIAL COURT

Defendants' final claim is that the fraud verdict was prejudicially tainted by the trial court's comments at trial and by erroneous evidentiary rulings. Defendants contend that the errors, either individually or cumulatively, require reversal and remand for a new trial.

Defendants cite several instances in which the trial court allegedly made improper comments. As defendants concede, no objections were raised below. Despite the lack of objection, defendants urge us to address the propriety of the comments under a plain error standard.[57] Under that standard, an error requires reversal when it is "plain," i.e., obvious to the trial court, and also harmful, i.e., affects the substantial rights of the accused.[58] We have reviewed the allegedly prejudicial comments and do not believe that any of them were egregious enough to qualify as harmful. We therefore find that the plain error standard has not been met.[59]

■ Next, defendants point to several alleged erroneous evidentiary rulings made by the trial court during the course of the trial. We have reviewed all of the alleged evidentiary errors and find only one to be of merit. During plaintiffs' case-in-chief, the trial court prohibited defendants from cross-examining two of plaintiffs' witnesses to establish their potential bias. The court reasoned that defendants' line of questioning was beyond the scope of direct examination and prohibited it on that basis.

It is well established that testimony reflecting on the bias of a witness is admissible at trial.[60] A trial court may limit witness examination to " 'preclude repetitive and unduly harassing interrogation' "[61] but normally cannot so rule simply because the

---

**56.** 817 P.2d at 810–11. The inverse nature of the punitive damage ratio in this case further supports our conclusion that the award is not excessive. *See Synergetics,* 701 P.2d at 1113.

**57.** *See* Utah R.Evid. 103(d) ("Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.").

**58.** *State v. Eldredge,* 773 P.2d 29, 35 (Utah), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 29 (1989); *see also Whitehead v. American Motors Sales Corp.,* 801 P.2d 920, 928 (Utah 1990).

**59.** The fact that the jury received an instruction ordering it to draw no inferences from the trial judge's acts, statements, or evidentiary rulings further supports our finding that no error occurred.

**60.** *See* Utah Code Ann. § 78–24–1 ("[I]n every case the credibility of the witness may be drawn into question...."); Utah R.Evid. 608(c) ("Bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced."); *State v. Hackford,* 737 P.2d 200, 203 (Utah 1987); *State v. Leonard,* 707 P.2d 650, 656 (Utah 1985); *State v. Patterson,* 656 P.2d 438 (Utah 1982).

**61.** *Leonard,* 707 P.2d at 656 (quoting *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974)); *see also* Utah R.Evid. 403.

desired line of questioning exceeds the scope of direct. As we stated in *State v. Leonard:*

> [T]he scope of cross-examination as to credibility is and must be broad if it is to fulfill its designated purpose of exposing bias and purging testimony of intended or unintended error. Full exposure of a witness' bias or prejudice is essential if a jury is to be able to fully assess the existence and extent of the witness' bias.[62]

Hence, the trial court erred by refusing to allow defendants to cross-examine two of plaintiffs' witnesses for potential bias. We must therefore determine whether that error so affected defendants' substantial rights as to warrant reversal.[63]

After a careful review, we conclude that the error was harmless, given the totality of the circumstances in which it was made. Although the testimony in question, if elicited, may have revealed some bias on the part of the two witnesses, such bias would not be enough to negate the substantial evidence of fraud present in this case.[64] Hence, there is no reasonable likelihood that the error affected the outcome of the proceedings, and the error does not necessitate reversal.

## VI. COSTS

■ Finally, defendants contend that the trial court erred by awarding $12,260 in costs to plaintiffs. Specifically, defendants attack the $11,503 awarded for forty-three depositions and the $631.75 awarded for witness fees. Defendants claim that the trial court erred by granting costs to plain-tiffs for all of the depositions taken because not all of them were "reasonably necessary for trial." The depositions were unnecessary, defendants argue, because several people who were deposed never testified at trial and three others did not need to be deposed because they already had been interviewed informally. Moreover, defendants contend that the costs awarded for witness fees should be vacated because several of the fees exceeded the statutory rate permitted under Utah Code Ann. § 21–5–4.

According to Utah Rule of Civil Procedure 54(d)(1), "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." The determination to award taxable costs is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion.[65] This court has consistently held that deposition costs are recoverable " 'subject to the limitation that the trial court is persuaded that they were taken in good faith and, in the light of the circumstances, appeared to be essential for the development and presentation of the case.' "[66]

We note at the outset that plaintiffs submitted a verified memorandum of costs, defendants answered with a motion to tax costs seeking to limit plaintiffs' recovery for various reasons, and defendants submitted a reply. The trial court duly considered the pleadings and reduced the cost award from the $27,737.85 originally sought by plaintiffs to $12,260.35.

---

**62.** *Leonard,* 707 P.2d at 656 (citations omitted).

**63.** *See State v. Hamilton,* 827 P.2d 232, 240 (Utah 1992); *State v. Speer,* 750 P.2d 186, 189 (Utah 1988); *State v. Rammel,* 721 P.2d 498, 499–500 (Utah 1986); *In re Hock,* 655 P.2d 1111, 1117 (Utah 1982).

**64.** *Cf. Patterson,* 656 P.2d at 439–40 (trial court's error in prohibiting cross-examination for bias was harmless given overwhelming weight of evidence against defendant); *Hackford,* 737 P.2d at 205–06 (trial court's error in prohibiting cross-examination for bias of prosecution witness deemed harmless); *Slusher v. Ospital,* 777 P.2d 437, 444 (Utah 1989) (trial court's error in not disclosing settlement agreement to jury was harmless given totality of circumstances); *In re Hock,* 655 P.2d at 1117 (exclusion of hearsay evidence would not have presented likelihood of different result).

**65.** *Cornish Town v. Koller,* 817 P.2d 305, 316 (Utah 1991); *Highland Constr. Co. v. Union Pac. R.R.,* 683 P.2d 1042, 1051 (Utah 1984); *Frampton v. Wilson,* 605 P.2d 771, 773–74 (Utah 1980); *First Sec. Bank of Utah, N.A. v. Wright,* 521 P.2d 563, 567 (Utah 1974).

**66.** *Highland Constr. Co.,* 683 P.2d at 1051 (quoting *Frampton,* 605 P.2d at 774); *see also First Sec.,* 521 P.2d at 566–67.

We find nothing in the record indicating that the trial court acted unreasonably by awarding costs for all of the depositions taken. Instances often exist in which a deponent is not called at trial, yet information essential for the development of the case is nonetheless learned from his or her deposition testimony. Moreover, this court has stated that deposition costs will be allowed "where the development of the case is of such a complex nature that discovery cannot be accomplished through the less expensive method of interrogatories, requests for admissions and requests for the production of documents."[67] The trial court undoubtedly determined that this fact-intensive $4 million fraud case justified the extensive deposition testimony utilized by both parties.

Furthermore, the trial court is in the best position to determine which depositions are reasonably necessary for the development and presentation of the case. We cannot say that in this case, the trial court's decision to grant costs for the depositions of those deposed but not called as witnesses and for those previously interviewed and later deposed was an abuse of discretion.[68]

We are unable to reach defendants' claim that several of the witness fees exceeded the statutory rate set forth in Utah Code Ann. § 21–5–4 because defendants failed to supply a sufficient record for our review or to brief adequately the issue on appeal.[69] While the record does show that several witnesses were given checks in an amount greater than the statutorily authorized $17,[70] we have no way of telling why the amounts exceeded $17 or even which witness fees are deemed excessive. Moreover, defendants do not specifically state which provision of section 21–5–4 was violated.

Therefore, we cannot, and will not, address this issue.[71]

We have reviewed defendants' other claims and determine them to be without merit.[72] We therefore affirm the jury verdict, including the compensatory and punitive damage award, as issued below.

STEWART, DURHAM and ZIMMERMAN, JJ., concur.

HOWE, Associate C.J., concurs in the result.

---

67. *Highland Constr. Co.,* 683 P.2d at 1051.

68. We also note that this case does not involve the situation where "the award of costs must be narrowly made to guard against abuse by those better financially equipped lest costs of seeking justice become prohibitive for the financially ill equipped." *Id.* Both parties are far from destitute, and both made extensive use of depositions as a discovery tool.

69. *See* Utah R.App.P. 24(a)(9).

70. *See* Utah Code Ann. § 21–5–4(1)(a).

71. *See State v. Bishop,* 753 P.2d 439, 450 (Utah 1988); *State v. Amicone,* 689 P.2d 1341, 1344 (Utah 1984).

72. *See State v. Carter,* 776 P.2d 886, 896 (Utah 1989).